Nichole FORCE, by Her Next Friends,
Renee FORCE and Vinson
Force, Plaintiffs,

v.

PIERCE CITY R–VI SCHOOL
DISTRICT, et al., Defendants,

Missouri State High School Activities
Association, Intervenor.

No. 82–5093–CV–SW–0.

United States District Court,
W.D. Missouri,
Southwestern Division.

Aug. 15, 1983.

---

Karon D. Ramsey, Kansas City, Mo., for plaintiffs.

Ransom A. Ellis III, Springfield, Mo., for defendants.

J. Robert Tull, Columbia, Mo., for intervenor.

## MEMORANDUM OPINION AND ORDERS

ROSS T. ROBERTS, District Judge.

Nichole Force, a thirteen year old female student enrolled in the eighth grade at the Pierce City, Missouri, Junior High School, seeks an injunction which would allow her to compete for a place on the school's eighth grade football team. Her claims are relatively simple and straightforward: that de-

fendants' refusal to accord her that opportunity is based—and based solely—upon the fact that she is a female rather than a male, and that a sex-based determination of that sort violates her right to the equal protection of the laws under the Fourteenth Amendment, and in turn 42 U.S.C. § 1983.

Named as defendants are the Pierce City R–VI School District, which operates and administers the Pierce City Junior High School facility, the Superintendent of the School District (John A. Williams), and the Principal of the School (Raymond Dykens). In addition, the Missouri State High School Activities Association ("MSHSAA") has been permitted to intervene in the matter, upon its assertion that plaintiff's claims call into question Section 1.6 of its rules governing interscholastic competition between secondary schools in the State of Missouri. MSHSAA is an unincorporated association composed of approximately 80% of the public junior and senior high schools in Missouri, together with a number of private, parochial and state educational institutions, whose rules concerning secondary school interscholastic competition are considered binding by its members. Pierce City Junior High School is one of those members.

The matter was tried to the Court, in a full plenary hearing,[1] on August 1, 2 and 3, 1983. Having now considered the evidence produced at that hearing, as well as the parties' pre- and post-trial briefs, I conclude, for the reasons stated in Section II of this opinion, that plaintiff's claim for injunctive relief must be granted.

I.

BACKGROUND

Pierce City Junior High School is a public school facility made up of the seventh, eighth and ninth grades. It is operated as a component part of the defendant Pierce City R–VI School District ("the District").

The District itself is an entity established under state law, see generally Chapter 162, R.S.Mo.1969 (as amended), and is governed by a six-member Board ("the Board"). Missouri law gives the Board the authority to "make all needful rules and regulations for the organization, grading and government in the school district." Section 171.011, R.S. Mo.1969 (as amended).

Pursuant to its statutory authority, the Pierce City R–VI Board has for some time maintained an athletic program at both the junior and senior high school levels. For junior high school students (females as well as males), participation in that program is mandatory. The program requirements, however, can be met either by attending physical education classes or (at least in part) by partaking of the interscholastic athletic team programs which the school sponsors.[2] For the period in question here, those interscholastic athletic team programs have been as follows:

| SEASON | BOYS | GIRLS |
| --- | --- | --- |
| Fall | Football | Volleyball |
| Winter | Basketball | Basketball |
| Spring | Track | Track |

As may be noted, there is no football team for girls, and no volleyball team for boys.

Sometime during the spring of 1982, Nichole Force mentioned to her mother that she was greatly looking forward, that coming fall, to trying out for the seventh grade football team. Since Nichole had already been involved to a considerable extent in athletics (swimming, diving, organized softball, organized basketball and elementary school football), and since she had grown up with two brothers who excelled at football and who encouraged and helped her in her own athletic endeavors, her mother was perhaps less startled than some mothers might have been. Family debate ensued, nonetheless. After an apparently frank

---

1. The parties have agreed that the trial of this action on the merits should be advanced and consolidated with the hearing on plaintiff's motion for a preliminary injunction. See Rule 65(a)(2), Fed.R.Civ.P.

2. The teams are of the so-called "no-cut" variety. This means that all who report for practice are allowed to continue practicing, and competing for a chance to play in a game, even though they may have only limited success or no success at all.

and thorough discussion on the matter, Mrs. Force decided to approach the school authorities to see what might be done.

Mrs. Force spoke first with the boys' athletics coach for the school. He stated that so long as the school administration approved, he would let Nichole participate. Mrs. Force then sought out the appropriate school administrative officials. They advised her that the matter would have to be presented to the Board for its decision.

Mrs. Force met with the Board on two occasions. At the first of those meetings, on May 17, 1982, Mrs. Force presented her request that Nichole be permitted to participate in the seventh grade football program, coupling that request with a presentation of the statistics and relevant case law which she felt supported her position. The Board voted to table the matter until its next meeting, stating that the members wished to consult with their constituents to determine what the community attitude on the subject might be. At the second meeting, held on June 21, 1982, an open discussion of the matter took place, during which various of the Board members expressed concern over the potential precedent involved in granting the request (e.g., the possibility that boys would wish to participate on the girls' volleyball team, and that high school girls might wish to play on the high school football team), the potential safety risk to a female competing in a contact sport with males, the administrative difficulties that might ensue (arrangements for locker room facilities, etc.), and that, at least as some Board members understood it, the applicable provisions of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681 et seq, and the regulations thereunder, 34 C.F.R. § 106.41 (previously 45 C.F.R. § 106.41), or the provisions of Section 1.6 of the MSHSAA rules, might be violated by permitting co-educational participation in a contact sport. Following that discussion, the Board voted unanimously to deny the request. According to Mrs. Force, defendant John Williams explained the decision to her by stating that while "they all agreed" Nichole would be a good football player and would have no problems playing, if she were permitted to play the same allowance would have to be made for all other girls as well.

Suit was instituted on October 1, 1982. Unfortunately, by the time service of process had been obtained the 1982 football season was completed. Because of Nichole's continuing desire to try out for football (now at the eighth grade level), however, and the Board's continuing refusal to permit her to do so, the case has been treated by all concerned as continuing to present the same issues in connection with the fall 1983 football season. With no pressing need for an interim ruling during the winter and spring of 1982–83, the matter was set for a trial on the merits commencing August 1, 1983, thus allowing the parties ample time to develop all of the evidence they felt might bear on the troublesome and rather sensitive issues presented.

II.

DISCUSSION

■ The record makes clear, and I find, that defendants' refusal to grant plaintiff's request is the product of a gender-based classification. Stated simply, only males are permitted to compete for a place on the Pierce City Junior High School eighth grade football team. Since Nichole is a female, that opportunity is denied to her.

The principles which must govern in this situation are summarized in the opening passages of Section II of the Supreme Court's recent decision in *Mississippi University For Women v. Hogan,* — U.S. ——, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). I can do no better than to quote those passages here:

"Because the challenged policy expressly discriminates among applicants on the basis of gender, it is subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *Reed v. Reed,* 404 U.S. 71, 75 [92 S.Ct. 251, 253, 30 L.Ed.2d 225] (1971).... Our decisions also establish that the party seeking to

uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification. *Kirchberg v. Feenstra,* 450 U.S. 455, 461 [101 S.Ct. 1195, 1199, 67 L.Ed.2d 428] (1981); *Personal Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 273 [99 S.Ct. 2282, 2293, 60 L.Ed.2d 870] (1979). The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' *Wengler v. Druggists Mutual Insurance Co.,* 446 U.S. 142, 150 [100 S.Ct. 1540, 1545, 64 L.Ed.2d 107] (1980).

Although the test for determining the validity of a gender based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether . . . the objective itself reflects archaic and steretypic notions. Thus if the . . . objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate. See *Frontiero v. Richardson,* 411 U.S. 677, 684–685 [93 S.Ct. 1764, 1769–1770, 36 L.Ed.2d 583] (1973) (plurality opinion).

If the State's objective is legitimate and important, we next determine whether the requisite direct, substantial relationship between objective and means is present. The purpose of requiring that close relationship is to assure that the validity of the classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women. The need for the requirement is amply revealed by reference to the broad range of statutes already invalidated by this Court, statutes that relied upon the simplistic, outdated assumption that gender could be used as a 'proxy for other, more germane bases of classification,' *Craig v. Boren,* 429 U.S. 190, 198 [97 S.Ct. 451, 457, 50 L.Ed.2d 397] (1976), to establish a link between objective and classification."

Defendants do not quarrel with the fact that the present case must be governed by these principles; indeed they candidly acknowledge that fact. They argue, rather, that in the circumstances shown here a gender-based classification fully satisfies those principles. To that end, they identify four "important governmental objectives" which are said to be at stake: (a) maximization of equal athletic educational opportunities for all students, regardless of gender; (b) maintenance of athletic educational programs which are as safe for participants as possible; (c) compliance with Title IX of the Educational Amendments of 1972 and the regulations thereunder; and (d), compliance with the constitution and by-laws of MSHSAA. According to defendants, there is a "substantial relationship" between each of these objectives and a gender based classification which would prevent any female from competing with males for a place on the Pierce City Junior High School eighth grade football team.

Defendants' suggestion with respect to the necessity of compliance with Title IX can, I think, be dealt with in relatively short order. There is in fact nothing whatsoever in Title IX, or in its implementing regulations (34 C.F.R. § 106.41(b)), which would mandate the action defendants have taken here.[3] To the contrary, Title IX's

---

**3.** 34 C.F.R. § 106.41(b) reads as follows:

"(b) *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes

regulations leave each school free to choose whether co-educational participation in a contact sport will be permitted. *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association,* 647 F.2d 651, 655–56 (6th Cir.1981). Allowing Nichole Force to compete with males for a place on the Pierce City Junior High School eighth grade football team would no more violate those regulations than would refusing her that opportunity. Title IX simply takes a neutral stand on the subject.[4]

■ Nor in my judgment can defendants' point regarding compliance with MSHSAA rules withstand scrutiny.[5] A school can hardly validate an otherwise unconstitutional act (assuming for the moment that there is one here) by noting that it has agreed with other schools to commit that act. There can be no doubt, of course, that MSHSAA performs a valuable and needed service for the schools and citizens of this state. But its rules cannot transcend constitutional requirements, and a member school's adherence to those rules cannot make constitutional that which is not.

I accordingly reject defendants' "objectives" (c) and (d) as providing any sort of appropriate predicate for the action taken here. Defendants' first two points, however, have more meat to their bones, and are deserving of more detailed treatment. Each will be examined separately below.

## A.

## MAXIMIZING PARTICIPATION IN ATHLETICS

■ One might wonder, at first blush, how denying all females the right to participate in a sport—which is the case here, since Pierce City eighth grade girls are not allowed to compete for a place on the only football team which might be available to them—will result in maximizing the participation of both sexes in athletics. And the short answer is that it probably does not. Defendants' argument in this regard, however, is sufficiently sophisticated to merit more than first blush treatment.

That argument proceeds on three interrelated theories. Defendants suggest, first, that males (as a class) will outperform females (as a class) in most athletic endeavors, given male size, speed and greater ratio of lean body mass. That being so, the argument proceeds, the best way in which to encourage and maximize female participation in athletics is by providing separate male and female teams, where males compete only against males and females only against females, since otherwise males will dominate the competition and ultimately discourage female participation. Pursuant to this idea, defendants have established separate interscholastic athletic programs for the two sexes in the Pierce City secondary schools, with the fall season sport being football for males and volleyball for females. But if (second) Nichole Force is permitted to compete for a place on the football team, then other girls must be accorded the same privilege, and boys must be allowed to compete for positions on the volleyball team. When (third) that happens, the girls will lose their best athletes, the boys will come to dominate volleyball, and overall female participation will ultimately wither.

of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact."

4. To the extent that defendants' argument in this connection is based upon "maximization" of athletic opportunities, regardless of sex, the subject will be treated in Subsection A hereof.

5. Section 1.6 of the MSHSAA by-laws, in pertinent part, reads as follows:
   "A school, at its own discretion, may allow a student to compete on a team with the opposite sex in baseball, cross country, golf, gymnastics, soccer, softball, swimming, tennis, track or volleyball, provided the school does not offer interscholastic competition for both sexes in that sport."
   This language obviously does not directly prohibit co-educational participation in contact sports. The parties have stipulated, however, that "as applied to the facts of this case, [the rule] does not permit members of the opposite sex to compete on the same team in interscholastic football."

Based upon the expert testimony presented in this case I am willing to accept the proposition that the average male, even at age 13, will to some extent outperform the average female of that age in most athletic events, although the matter may be open to some dispute.[6] And I note, without being called upon to decide the issue, that a number of courts have held that the establishment of separate male/female teams in a sport is a constitutionally permissible way of dealing with the problem of potential male athletic dominance. See *Ritacco v. Norwin School District*, 361 F.Supp. 930 (W.D.Pa.1973); *Bucha v. Illinois High School Association*, 351 F.Supp. 69 (N.D.Ill. 1972); *Ruman v. Eskew*, 168 Ind.App. 428, 343 N.E.2d 806 (1976), and *cf. O'Connor v. Board of Education of School District No 23*, 645 F.2d 578, 581 (7th Cir.), cert. den. 454 U.S. 1084, 102 S.Ct. 641, 70 L. Ed.2d 619 (1981), on remand 545 F. Supp. 376 (1981); *Hoover v. Meiklejohn*, 430 F.Supp. 164, 170 (D.Colo.1977); *Gilpin v. Kansas State Activities Ass'n., Inc.*, 377 F.Supp. 1233, 1243 (D.Kan.1973); *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc.*, 378 Mass. 342, 393 N.E.2d 284, 296 (1979). Beyond these two points, however, I am unable to accept defendants' argument.

The principal difficulty with the remaining portions of that argument, it seems to me, is that the various hypotheses used to bind it together are just that—hypotheses, and nothing more. There is, for example, no factual indication that the girls' eighth grade volleyball team will be blighted by the defection of its best players to the football field, if Nichole Force is allowed to play football. To the contrary, defendants' own testimony is that Nichole Force is the first and only girl, at any grade level, who has ever made a request to play football. And for that matter, if defendants are correct in their position that females are unable to compete successfully with males in athletics, particularly in contact sports, it is to be expected that such defections would be short-lived in any event, and that the situation would prove to be self-regulating. See *Fortin v. Darlington Little League*, 514 F.2d 344, 350 (1st Cir.1975).

Nor is there any factual indication that eighth grade boys at Pierce City Junior High School are waiting eagerly for volleyball to be desegregated. Again to the contrary, there is no indication that any boy has ever expressed a desire to play on the volleyball team. Indeed, there may be something of a false premise involved in the idea that volleyball in the Pierce City R–VI

---

6. The various studies and statistics relied upon by both defendants' expert, Dr. Harold Falls (a professor in Health, Physical Education and Biology at Southwest Missouri State College and the Director of the Human Performance Laboratory there), and plaintiff's expert, Dr. N. Peggy Burke (Chairman of the Department of Physical Education at the University of Iowa), suggest that at age 13 the average female tends to be slightly taller and heavier than the average male of that age, although there is a wide range of variance amongst all the members in both sexes. It would appear, on the other hand, that the average boy at that age has a very slightly higher ratio of lean body mass (muscle and bone mass) to fat mass, and a somewhat higher ratio of lean body mass to heighth, has heavier bones, may have somewhat more speed and upper body strength, and has somewhat better motor coordination. Some of these characteristics, particularly lean body mass ratios, relate to achievement of sexual maturity (which in girls averages between the 12th and 13th years), since girls begin to develop more fat mass at sexual maturity. But

in any event there is some overlap with respect to these characteristics as between males and females at age 13, although the extent of that overlap was disputed by Dr. Falls and Dr. Burke. After age 13 these differences begin to widen appreciably as between the "average" boy and the "average" girl, and by the time the later teens are reached the "average" male has not only greatly widened the gap in terms of lean body mass ratio, but has also considerably surpassed the "average" female in terms of heighth and total body weight.

All of the above physiological factors are said to have a bearing on one's physical ability to compete in a sport. There are, obviously, other factors involved as well, including conditioning, desire and intelligence. And according to Dr. Burke, the statistics may also be skewed to some extent by the fact that conditioning can have a bearing on lean body mass ratios, and the fact that females have in the past been less physically active than males, by virtue of the roles society has assigned them, although there are no studies to support this.

School District is in fact segregated, since nothing in the MSHSAA rules would prevent boys from competing with girls on a volleyball team, and since defendants themselves have never articulated any such rule.[7] Instead, it would seem, the question has simply never arisen. And in any event, it is by no means clear that the District would be constitutionally required to permit boys to participate in girls' volleyball, even if girls were allowed to participate in football. See *Clark v. Arizona Interscholastic Association,* 695 F.2d 1126, 1131–32 (9th Cir.1982); *Petrie v. Illinois High School Association,* 75 Ill.App.3d 980, 31 Ill.Dec. 653, 394 N.E.2d 855 (1979) (both holding, on a theory similar to that utilized in *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), that the governmental interest in redressing past discrimination against women in athletics is sufficient to justify a regulation which excludes boys from participating on girls' teams, even though girls are allowed to compete on boys' teams).[8]

Finally, even if by some chance defendants' worst case scenario should be realized, there might still be no need for the general breakdown which defendants postulate. For example, if a sufficient number of girls wish to play football, one obvious solution would be to organize a girls' football team; or if so many boys wish to play volleyball that they would dominate the girls' competition in that sport, to form a boys' volleyball team. See *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc., supra* 393 N.E.2d at 295. Such solutions would of course presumably involve added expense to the District, but there is no evidence on how troublesome

that factor might be,[9] and I cannot decide this case by adding speculation on that subject to an already lengthy list of other speculative items.

All this is not to say that I view defendants' argument as made in bad faith. It is simply to say, rather, that I must base my decision in this case upon the here and now, rather than upon mere possibilities which may well never occur; upon facts rather than conjecture: a view a number of courts have expressed when presented with similar arguments in this sort of controversy. See, *e.g., Brenden v. Independent School District,* 477 F.2d 1292, 1302 (8th Cir.1973); *Gomes v. Rhode Island Interscholastic League, supra* at 665–66; *Carnes v. Tennessee Secondary School Athletic Ass'n.,* 415 F.Supp. 569, 571–72 (E.D.Tenn.1976); *Gilpin v. Kansas State Activities Ass'n., Inc., supra* at 1242 (D.Kan.1972); *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc., supra* 393 N.E.2d at 294–96; *Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882, 892 (1975) (en banc); *Commonwealth v. Pennsylvania Interscholastic Athletic Association,* 18 Pa.Cmwlth. 45, 334 A.2d 839, 842 (1975); *Haas v. South Bend Community School Corporation,* 259 Ind. 515, 289 N.E.2d 495, 500 (1972). The fact of the matter is that no girl other than Nichole Force has expressed a desire to play football, and that apparently no boy at all has expressed a desire to play volleyball.

■ There is, however, a further point implicit in defendants' argument on this subject which should be addressed before passing on: the apparent assumption that if, in the interest of maximizing equal ath-

---

**7.** In fact, according to one construction which has been given the regulations under Title IX, the School District might already be *required* to let boys participate on the volleyball team, regardless whether girls play football. See *Gomes v. Rhode Island Interscholastic League,* 469 F.Supp. 659 (D.R.I.1979), *vacated as moot,* 604 F.2d 733 (1st Cir.1979). *Contra, Mularadelis v. Haldane Central School Board,* 74 App. Div.2d 248, 427 N.Y.S.2d 458 (1980).

**8.** But see *Gomes v. Rhode Island Interscholastic League, supra* n. 7, and *Attorney General v. Massachusetts Interscholastic Athletic Associa-*

*tion, supra* (both holding that such "reverse" disparate treatment is impermissible).

**9.** There was testimony that attempting to meet Dr. Falls' ideal of segregating players on the basis of physical ability and skill would require at least three teams (presumably per grade) in each sport, and would in turn impose a difficult if not impossible burden on the existing coaching staff. That does not tell me, however, how difficult or expensive it might be to field a boys' volleyball team or a girls' football team.

letic opportunities, it is constitutionally permissible to establish separate male and female teams in a given sport and to exclude each sex from the other's team, cases *supra,* then it is equally permissible, in that same interest, to designate separate male and female sports and to exclude each sex from participation in the other's sport. That is a proposition I am unwilling to accept, at least as a general matter. See *Clark v. Arizona Interscholastic Association, supra* at 1130–31; *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc., supra* 393 N.E.2d at 289–90.[10]

Each sport has its own relatively unique blend of requirements in terms of skills and necessary physical attributes, and each person, male or female, will for a variety of reasons probably find one or another sport more enjoyable and rewarding than others. In point of fact, volleyball is *not* football; and baseball is *not* hockey; and swimming is *not* tennis. Accordingly, if the idea is to "maximize educational athletic opportunities for all students, regardless of gender," it makes no sense, absent some substantial reason, to deny all persons of one sex the opportunity to test their skills at a particular sport. Of course there may be certain exceptional instances in which there is a "substantial reason" for such an exclusion, as for example where peculiar safety and equipment requirements demand it, see *Lafler v. Athletic Board of Control,* 536 F.Supp. 104 (W.D.Mich.1982) (boxing), or perhaps where excluding males is necessary to redress past inequality and to foster female participation, see *Clark v. Arizona Interscholastic Association, supra; Petrie v. Illinois High School Association, supra.* But those instances would, I think, be relatively rare, and would need to be factually established. And that is precisely where defendants' present argument fails, as far as the instant case is concerned.

I do not question the idea that maximizing the participation of both sexes in interscholastic athletic events is a worthy, and important, governmental objective. Nor do I question the sincerity of defendants' efforts in that regard.[11] In the circumstances of this case, however, I must and do hold that the gender based classification used by defendants does not bear a sufficiently "substantial" relationship to that objective to withstand a constitutional challenge.

## B.

### SAFETY

■ Neither do I question the fact that the "maintenance of athletic educational programs which are as safe for participants as possible" is an "important governmental objective." Indeed, that would seem obvious. Again, however, the facts of this case do not demonstrate a sufficiently "substantial" relationship between that objective and a blanket rule which prohibits all eighth grade females from competing for a place on the Pierce City Junior High School eighth grade football team.

There is no evidence, or even any suggestion, that Nichole Force herself could not safely participate in that football program. And while I do find, from the expert testimony presented, that a "typical" (i.e., average) 13 year old female would in fact, to some degree, have a higher potential for injury in mixed-sex football than would a "typical" (i.e., average) 13 year old male, this does not in my judgment greatly assist the defendants' argument.[12] The problem,

10. A contrary suggestion was made in *Mularadelis v. Haldane Central School Board, supra* n. 7. For the reasons stated in the text, I believe the conclusion reached in *Clark* and *Attorney General, supra,* is more sound.

11. In fact defendants appear, in general, to have done an excellent job in making athletic opportunities available to females, and in dealing with problems which, until a few years ago, were not even recognized by most of us.

12. There are apparently no studies which have compared the incidence of injuries as between males and females playing football, or any other contact sport at age 13, either on segregated teams or co-educational teams. The potential for injury, however, at least in contact sports, is said to be related to the physical characteristics mentioned in footnote 5, particularly lean body mass ratios. If that is so, to that extent perhaps the "average" boy at age 13 will have somewhat less potential for injury in football

of course, is that not all 13 year old females are "typical," any more than all 13 year old males are "typical." Indeed, as defendants' own expert candidly admitted, some 13 year old females could safely play eighth grade football in mixed sex competition, and some 13 year old males could not. And yet I note that the Pierce City R–VI School District permits *any* male to compete in football, regardless of his size, speed, body type, lean body mass, fat body mass, bone structure, "Q" angle measurement or any other factor which might have a bearing on his potential for injury.

In short, the "safety" factor which defendants would utilize to prevent any female from playing eighth grade football— including those who could play safely—is not applied to males at all, even to those who could not play safely. All this tends to suggest the very sort of well-meaning but overly "paternalistic" attitude about females which the Supreme Court has viewed with such concern.[13] See, e.g., *Frontiero v. Richardson,* 411 U.S. 677, 684–87, 93 S.Ct. 1764, 1769–71, 36 L.Ed.2d 583 (1973).

■ It is of course true, as defendants point out, that the Supreme Court has recognized that governmental bodies are free to take into account *actual* differences between the sexes, including physical ones, with the result that a statute or policy which employs a gender based classification will be upheld where that classification merely reflects the fact that the sexes are not "similarly situated" in certain circumstances. See *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) (noting, in reference to a statutory rape law which penalized males only, that "only women may become pregnant," *id.* at 471,

101 S.Ct. at 1205). I do not, however, read such observations to be an endorsement of the use of broad generalizations which— while perhaps empirically supported *as generalizations*—do not hold true for all members of a sex. In fact the Supreme Court has rather consistently rejected that idea, see, e.g., *Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 151–52, 100 S.Ct. 1540, 1545–46, 64 L.Ed.2d 107 (1980); *Caban v. Mohammed,* 441 U.S. 380, 394, 99 S.Ct. 1760, 1769, 60 L.Ed.2d 297 (1979); *Califano v. Goldfarb,* 430 U.S. 199, 204–05, 97 S.Ct. 1021, 1025–26, 51 L.Ed.2d 270 (1977); *Weinberger v. Wisenfeld,* 420 U.S. 636, 645, 95 S.Ct. 1225, 1231, 43 L.Ed.2d 514 (1975); *Frontiero v. Richardson, supra; Reed v. Reed,* 404 U.S. 71, 77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971), since a gender based classification which results from ascribing a particular trait or quality to one sex, when not all share that trait or quality, is not only inherently unfair but generally tends only to perpetuate "stereotypic notions" regarding the proper roles of men and women.

■ This is not to say that reliance upon a factually established generalization concerning a particular male or female trait might never be appropriate. But there must obviously be a substantial justification (or perhaps even an "exceedingly persuasive" justification, see *Mississippi University For Women v. Hogan, supra*) for using such an imprecise and potentially mischievous tool for these purposes; and the only justification which might even arguably be applied in such circumstances would be that of "administrative ease" to the governmental body. That, in turn, is an argument which has never fared well at the hands of the Supreme Court, see, e.g., *Wen-*

than the "average" girl at age 13. In addition, girls who have reached sexual maturity (on the average between 12 and 13 years, although in some instances much later) begin to develop a wider hip structure, and the angle between the hip and the knee (called the "Q angle") increases, with resulting potential for increased knee injury. How significant that increased "Q angle" is, and just what its real potential for increased knee injury in football might be, was a subject disputed by Dr. Falls and Dr. Burke.

**13.** The reference here is to governmental attitudes, not parental attitudes. Any parent who feels that his or her child should not play football, or any other interscholastic sport for that matter, remains quite free to withhold consent to that child's participation. The school requires such parental consent before any child is permitted to compete on one of the interscholastic teams.

gler v. Druggist Mutual Ins. Co., supra; Califano v. Goldfarb, supra; Frontiero v. Richardson, supra, and I reject it here for the simple reason that it is sophistry to suggest a concern with the "administrative burden" of weeding out physically unfit 13 year old females in connection with a football program when there is no concern at all with weeding out physically unfit 13 year old males involved in the same program. In fact, I think, it might be rather difficult to sustain a requirement that females competing for a place on a particular athletic team be subjected to a fitness screening program, when males competing for a place on the same team are subjected to none at all.

I conclude, accordingly, that there is an insufficient relationship between defendants' announced goal of "safety" and a rule which automatically excludes all eighth grade females from competing with eighth grade males for a place on a football team. That holding, I note, is consistent with the result reached by virtually every other court which has considered this same sort of "safety" argument in connection with male/female competition in contact sports. See *Fortin v. Darlington Little League, Inc., supra* (baseball); *Leffel v. Wisconsin Interscholastic Athletic Ass'n.*, 444 F.Supp. 1117, 1122 (E.D.Wis.1978) (all sports); *Hoover v. Meiklejohn, supra* at 169 (soccer); *Carnes v. Tennessee Secondary School Athletic Ass'n., supra* (baseball); *Clinton v. Nagy*, 411 F.Supp. 1396, 1398–1400 (N.D. Ohio 1974) (football); *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc., supra* 393 N.E.2d at 293–94 (all sports); *Darrin v. Gould, supra* (football); *Commonwealth v. Pennsylvania In-*

terscholastic Athletic Association, supra 334 A.2d at 843 (all sports); *National Organization For Women, Etc. v. Little League Baseball, Inc.*, 127 N.J.Super. 522, 318 A.2d 33, 36–7 (1974) (baseball).[14]

### C.

### MSHSAA RULE 1.6

■ The general nature of the Missouri State High School Activities Association has been noted previously. For present purposes it should also be mentioned that MSHSAA is supported, at least in part, by dues which are paid by its member schools; that the member schools retain the power to amend its constitution by a two-thirds majority of the member schools voting, and to amend its by-laws by a majority vote of member schools voting; that its executive affairs are administered by a Board of Control composed of eight persons, each of whom must be an active school superintendent or principal of a member school located within one of the eight membership districts into which the state is subdivided; that the initial responsibility for assuring compliance with its rules and regulations is placed in the hands of the principal or superintendent of each member school; and that sanctions may be imposed for a violation of those rules and regulations, extending to a monetary fine or suspension from the Association.

Given these facts, it is clear that MSHSAA's actions amount to "state action" within the meaning of the Fourteenth Amendment. Compare *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic As-*

---

14. I do not consider the holding in *Lafler v. Athletic Board of Control, supra,* to be inconsistent with the reasoning expressed here and in those cases cited above. As the court there noted, the necessity that plaintiff (a female) wear a protective chest covering would violate Amateur Boxing Federation rules, and I gather would give her something of an unfair advantage in any event. The court expressly noted the difference between the case before it and cases involving football, soccer and baseball.

The only contrary holding I find is *Magill v. Avonworth Baseball Conference,* 364 F.Supp.

1212 (W.D.Pa.), vacated and remanded 497 F.2d 921 (3d Cir. 1974), involving baseball. The court's expressions on this subject might well be considered dicta, since the case had already been disposed of by the ruling that state action was not involved and hence that subject matter jurisdiction did not exist. In any event I note, with all respect, that the court utilized the "rational basis" test, and apparently relied upon nothing more than generalized assumptions about females as well, both of which are approaches out of step with present day Supreme Court requirements in this area.

*sociation, supra* at 652–53; *Brenden v. Independent School District, supra* at 1295; *Dodson v. Arkansas Activities Ass'n.,* 468 F.Supp. 394, 396 (E.D.Ark.1979); *Leffel v. Wisconsin Interscholastic Athletic Ass'n., supra* at 1119; *Gilpin v. Kansas State Activities Ass'n., Inc., supra* at 1237; *Reed v. Nebraska School Activities Ass'n.,* 341 F.Supp. 258, 259–61 (D.Neb.1972); *Darrin v. Gould, supra* 540 P.2d at 891; *Commonwealth v. Pennsylvania Interscholastic Athletic Association, supra* 334 A.2d at 842. Its rules and regulations are accordingly subject to the requirements of the Equal Protections Clause. Cases *supra.*

Section 1.6 of the MSHSAA by-laws has been quoted in full at footnote 3 of this opinion. As was noted there, while its terms do not expressly prohibit male/female competition in contact sports, including football, the parties have stipulated that "as applied to the facts in this case [the rule] does not permit members of the opposite sex to compete on the same team in interscholastic football." That being so the rule is, "as applied to the facts in this case," subject to the same constitutional infirmities as the School District's decision, and its enforcement here will be enjoined.[15]

### CONCLUSION

Nichole Force obviously has no legal entitlement to a starting position on the Pierce City Junior High School eighth grade football team, since the extent to which she plays must be governed solely by her abilities, as judged by those who coach her. But she seeks no such entitlement here.

Instead she seeks simply a chance, like her male counterparts, to display those abilities. She asks, in short, only the right to try.

I do not suggest there is any such thing as a constitutional "right to try." But the idea that one should be allowed to try—to succeed or to fail as one's abilities and fortunes may dictate, but in the process at least to profit by those things which are learned in the trying—is a concept deeply engrained in our way of thinking; and it should indeed require a "substantial" justification to deny that privilege to someone simply because she is a female rather than a male. I find no such justification here.[16]

It is, accordingly

ORDERED that the trial of this action on the merits shall be and is hereby consolidated with the hearing on plaintiff's motion for a preliminary injunction, pursuant to Rule 65(a)(2), Fed.R.Civ.P.; and it is further

ORDERED that defendant John A. Williams, as Superintendent of Schools of the

---

**15.** At least one case has held that such a rule, promulgated by an Association like MSHSAA, violates the regulations under Title IX, by purporting to remove the freedom of choice on this subject which those regulations give to the individual schools. See *Yellow Springs Exempted Village School District Board of Education v. Ohio State Athletic Association, supra.* MSHSAA argues that the decision is inapplicable to it, as an unincorporated association, since "it" is, under Missouri law, no more than the alter ego of each of its individual member schools. See *State ex rel Missouri State High School Activities Association v. Ruddy,* 643 S.W.2d 596 (Mo.1983) (en banc). Thus, the argument proceeds, the MSHSAA rule represents nothing more than each school's individual exercise of the discretion which the regulations under Title IX give to that school.

The difficulty with the argument is that the rule in question is one which, as a by-law, was adopted by a majority vote of MSHSAA's member schools. Its existence does not demonstrate that each member school voted for it. But it is binding on all member schools, regardless whether or not they approve it, and it can be changed only by a majority vote of the schools. An individual school thus is not free to accept or reject the rule as it might see fit. I do not find it necessary to pass upon the issue, however, since the holding I reach in the text above is sufficient to dispose of matters as far as this case is concerned.

**16.** For those interested, or merely curious, there would appear to be five other reported cases, involving football in whole or in part, which reach the same result reached here: *Leffel v. Wisconsin Interscholastic Athletic Ass'n, supra* (all sports); *Clinton v. Nagy, supra* (football); *Attorney General v. Massachusetts Interscholastic Athletic Association, Inc., supra* (all sports); *Darrin v. Gold, supra* (football); and *Commonwealth v. Pennsylvania Interscholastic Association, supra* (all sports). I find no cases involving football which reach a contrary result.

Pierce City R–VI School District, and defendant Raymond Dykens, as Principal of the Pierce City Junior High School, and defendant Pierce City R–VI School District, and each of them shall be and are hereby permanently restrained and enjoined from refusing to allow Nichole Force to compete for membership on the Pierce City Junior High School eighth grade interscholastic football team on the same basis that males are allowed to compete, during the time that she shall be enrolled in or eligible for enrollment in the eighth grade at such school facility; and it is further

ORDERED that the Missouri State High School Activities Association shall be and is hereby permanently restrained and enjoined from imposing any sanctions against the Pierce City R–VI School District, or any facility thereof, including the Pierce City Junior High School, in respect of Nichole Force competing for a place on the Pierce City Junior High School eighth grade football team or playing thereon in interscholastic competition, and from taking any other action which would interfere with the ability of Nichole Force to compete for a place on or play for the Pierce City Junior High School eighth grade football team, during the time that she shall be enrolled in or eligible for enrollment in the eighth grade at such school facility; and it is further

ORDERED that plaintiff's claim for an award of costs, including prevailing attorney's fees, shall be and is hereby severed and shall be heard and disposed of at a future time to be set by order of the court, and that the judgment and injunctive orders set forth in the preceding paragraphs hereof shall be and are hereby designated as final for purposes of appeal, and shall be entered as such, all pursuant to Rule 54(b), Fed.R.Civ.P., it being the Court's determination that there is no just reason to delay the entry and finality of the same.