# FRONTIERO et vir v. RICHARDSON, SECRETARY OF DEFENSE, et al.

No. 71–1694.   Argued January 17, 1973—Decided May 14, 1973

Mr. Justice Brennan, joined by Mr. Justice Douglas, Mr. Justice White, and Mr. Justice Marshall, concluded that 37 U. S. C. §§ 401, 403 and 10 U. S. C. §§ 1072, 1076, as inherently suspect statutory classifications based on sex, are so unjustifiably discriminatory as to violate the Due Process Clause of the Fifth Amendment.   Pp. 682–691.

Mr. Justice Stewart concluded that the challenged statutes work an invidious discrimination in violation of the Constitution. *Reed* v. *Reed*, 404 U. S. 71.   P. 691.

Mr. Justice Powell, joined by The Chief Justice and Mr. Justice Blackmun, while agreeing that the statutes deprive servicewomen of due process, concluded that in the light of *Reed* v. *Reed*, 404 U. S. 71, and the fact that the Equal Rights Amendment has been submitted to the States for ratification, it is inappropriate to decide at this time whether sex is a suspect classification.   Pp. 691–692.

BRENNAN, J., announced the Court's judgment and delivered an opinion, in which DOUGLAS, WHITE, and MARSHALL, JJ., joined. STEWART, J., filed a statement concurring in the judgment, *post*, p. 691. POWELL, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and BLACKMUN, J., joined, *post*, p. 691. REHNQUIST, J., filed a dissenting statement, *post*, p. 691.

*Joseph J. Levin, Jr.,* argued the cause for appellants. With him on the brief was *Morris S. Dees, Jr.*

*Samuel Huntington* argued the cause for appellees. On the brief were *Solicitor General Griswold, Assistant Attorney General Wood,* and *Mark L. Evans.*

*Ruth Bader Ginsburg* argued the cause for the American Civil Liberties Union as *amicus curiae* urging reversal. With her on the brief was *Melvin L. Wulf.*

MR. JUSTICE BRENNAN announced the judgment of the Court and an opinion in which MR. JUSTICE DOUGLAS, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join.

The question before us concerns the right of a female member of the uniformed services [1] to claim her spouse as a "dependent" for the purposes of obtaining increased quarters allowances and medical and dental benefits under 37 U. S. C. §§ 401, 403, and 10 U. S. C. §§ 1072, 1076, on an equal footing with male members. Under these statutes, a serviceman may claim his wife as a "dependent" without regard to whether she is in fact dependent upon him for any part of her support. 37 U. S. C. § 401 (1); 10 U. S. C. § 1072 (2)(A). A servicewoman, on the other hand, may not claim her husband as a "dependent" under these programs unless he is in fact dependent upon her for over one-half of his sup-

---

[1] The "uniformed services" include the Army, Navy, Air Force, Marine Corps, Coast Guard, Environmental Science Services Administration, and Public Health Service. 37 U. S. C. § 101 (3); 10 U. S. C. § 1072 (1).

port.  37 U. S. C. § 401; 10 U. S. C. § 1072 (2)(C).[2] Thus, the question for decision is whether this difference in treatment constitutes an unconstitutional discrimination against servicewomen in violation of the Due Process Clause of the Fifth Amendment.  A three-judge District Court for the Middle District of Alabama, one judge dissenting, rejected this contention and sustained the constitutionality of the provisions of the statutes making this distinction.  341 F. Supp. 201 (1972).  We noted probable jurisdiction.  409 U. S. 840 (1972).  We reverse.

I

In an effort to attract career personnel through reenlistment, Congress established, in 37 U. S. C. § 401 *et seq.,* and 10 U. S. C. § 1071 *et seq.,* a scheme for the provision of fringe benefits to members of the uniformed services on a competitive basis with business and industry.[3]  Thus, under 37 U. S. C. § 403, a member of the uniformed services with dependents is entitled to an

---

[2] Title 37 U. S. C. § 401 provides in pertinent part:

"In this chapter, 'dependent,' with respect to a member of a uniformed service, means—

"(1) his spouse;

.        .        .        .        .

"However, a person is not a dependent of a female member unless he is in fact dependent on her for over one-half of his support. . . ."
Title 10 U. S. C. § 1072 (2) provides in pertinent part:

" 'Dependent,' with respect to a member . . . of a uniformed service, means—

"(A) the wife;

.        .        .        .        .

"(C) the husband, if he is in fact dependent on the member . . . for over one-half of his support . . . ."

[3] See 102 Cong. Rec. 3849–3850 (Cong. Kilday), 8043 (Sen. Saltonstall); 95 Cong. Rec. 7662 (Cong. Kilday), 7664 (Cong. Short), 7666 (Cong. Havenner), 7667 (Cong. Bates), 7671 (Cong. Price).  See also 10 U. S. C. § 1071.

increased "basic allowance for quarters" and, under 10 U. S. C. § 1076, a member's dependents are provided comprehensive medical and dental care.

Appellant Sharron Frontiero, a lieutenant in the United States Air Force, sought increased quarters allowances, and housing and medical benefits for her husband, appellant Joseph Frontiero, on the ground that he was her "dependent." Although such benefits would automatically have been granted with respect to the wife of a male member of the uniformed services, appellant's application was denied because she failed to demonstrate that her husband was dependent on her for more than one-half of his support.[4] Appellants then commenced this suit, contending that, by making this distinction, the statutes unreasonably discriminate on the basis of sex in violation of the Due Process Clause of the Fifth Amendment.[5] In essence, appellants asserted that the discriminatory impact of the statutes is twofold: first, as a procedural matter, a female member is required to demonstrate her spouse's dependency, while no such burden is imposed upon male members; and, second, as a substantive matter, a male member who does not provide more than one-half of his wife's support receives benefits, while a similarly situated female member is denied such benefits. Appellants therefore sought a permanent in-

---

[4] Appellant Joseph Frontiero is a full-time student at Huntingdon College in Montgomery, Alabama. According to the agreed stipulation of facts, his living expenses, including his share of the household expenses, total approximately $354 per month. Since he receives $205 per month in veterans' benefits, it is clear that he is not dependent upon appellant Sharron Frontiero for more than one-half of his support.

[5] "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" *Schneider v. Rusk,* 377 U. S. 163, 168 (1964); see *Shapiro v. Thompson,* 394 U. S. 618, 641–642 (1969); *Bolling v. Sharpe,* 347 U. S. 497 (1954).

junction against the continued enforcement of these statutes and an order directing the appellees to provide Lieutenant Frontiero with the same housing and medical benefits that a similarly situated male member would receive.

Although the legislative history of these statutes sheds virtually no light on the purposes underlying the differential treatment accorded male and female members,[6] a majority of the three-judge District Court surmised that Congress might reasonably have concluded that, since the husband in our society is generally the "breadwinner" in the family—and the wife typically the "dependent" partner—"it would be more economical to require married female members claiming husbands to prove actual dependency than to extend the presumption of dependency to such members." 341 F. Supp., at 207. Indeed, given the fact that approximately 99% of all members of the uniformed services are male, the District

---

[6] The housing provisions, set forth in 37 U. S. C. § 401 et seq., were enacted as part of the Career Compensation Act of 1949, which established a uniform pattern of military pay and allowances, consolidating and revising the piecemeal legislation that had been developed over the previous 40 years. See H. R. Rep. No. 779, 81st Cong., 1st Sess.; S. Rep. No. 733, 81st Cong., 1st Sess. The Act apparently retained in substance the dependency definitions of § 4 of the Pay Readjustment Act of 1942 (56 Stat. 361), as amended by § 6 of the Act of September 7, 1944 (58 Stat. 730), which required a female member of the service to demonstrate her spouse's dependency. It appears that this provision was itself derived from unspecified earlier enactments. See S. Rep. No. 917, 78th Cong., 2d Sess., 4.

The medical benefits legislation, 10 U. S. C. § 1071 et seq., was enacted as the Dependents' Medical Care Act of 1956. As such, it was designed to revise and make uniform the existing law relating to medical services for military personnel. It, too, appears to have carried forward, without explanation, the dependency provisions found in other military pay and allowance legislation. See H. R. Rep. No. 1805, 84th Cong., 2d Sess.; S. Rep. No. 1878, 84th Cong., 2d Sess.

Court speculated that such differential treatment might conceivably lead to a "considerable saving of administrative expense and manpower." *Ibid.*

## II

At the outset, appellants contend that classifications based upon sex, like classifications based upon race,[7] alienage,[8] and national origin,[9] are inherently suspect and must therefore be subjected to close judicial scrutiny. We agree and, indeed, find at least implicit support for such an approach in our unanimous decision only last Term in *Reed* v. *Reed*, 404 U. S. 71 (1971).

In *Reed*, the Court considered the constitutionality of an Idaho statute providing that, when two individuals are otherwise equally entitled to appointment as administrator of an estate, the male applicant must be preferred to the female. Appellant, the mother of the deceased, and appellee, the father, filed competing petitions for appointment as administrator of their son's estate. Since the parties, as parents of the deceased, were members of the same entitlement class, the statutory preference was invoked and the father's petition was therefore granted. Appellant claimed that this statute, by giving a mandatory preference to males over females without regard to their individual qualifications, violated the Equal Protection Clause of the Fourteenth Amendment.

The Court noted that the Idaho statute "provides that different treatment be accorded to the applicants on the basis of their sex; it thus establishes a classification sub-

---

[7] See *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967); *McLaughlin* v. *Florida*, 379 U. S. 184, 191–192 (1964); *Bolling* v. *Sharpe, supra*, at 499.

[8] See *Graham* v. *Richardson*, 403 U. S. 365, 372 (1971).

[9] See *Oyama* v. *California*, 332 U. S. 633, 644–646 (1948); *Korematsu* v. *United States*, 323 U. S. 214, 216 (1944); *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943).

ject to scrutiny under the Equal Protection Clause." 404 U. S., at 75. Under "traditional" equal protection analysis, a legislative classification must be sustained unless it is "patently arbitrary" and bears no rational relationship to a legitimate governmental interest. See *Jefferson* v. *Hackney,* 406 U. S. 535, 546 (1972); *Richardson* v. *Belcher,* 404 U. S. 78, 81 (1971); *Flemming* v. *Nestor,* 363 U. S. 603, 611 (1960); *McGowan* v. *Maryland,* 366 U. S. 420, 426 (1961); *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970).

In an effort to meet this standard, appellee contended that the statutory scheme was a reasonable measure designed to reduce the workload on probate courts by eliminating one class of contests. Moreover, appellee argued that the mandatory preference for male applicants was in itself reasonable since "men [are] as a rule more conversant with business affairs than . . . women." [10] Indeed, appellee maintained that "it is a matter of common knowledge, that women still are not engaged in politics, the professions, business or industry to the extent that men are." [11] And the Idaho Supreme Court, in upholding the constitutionality of this statute, suggested that the Idaho Legislature might reasonably have "concluded that in general men are better qualified to act as an administrator than are women." [12]

Despite these contentions, however, the Court held the statutory preference for male applicants unconstitutional. In reaching this result, the Court implicitly rejected appellee's apparently rational explanation of the statutory scheme, and concluded that, by ignoring the individual qualifications of particular applicants, the challenged statute provided "dissimilar treatment for men and women who are . . . similarly situated." 404 U. S.,

[10] Brief for Appellee in No. 70–4, O. T. 1971, *Reed* v. *Reed,* p. 12.
[11] *Id.,* at 12–13.
[12] *Reed* v. *Reed,* 93 Idaho 511, 514, 465 P. 2d 635, 638 (1970).

at 77. The Court therefore held that, even though the State's interest in achieving administrative efficiency "is not without some legitimacy," "[t]o give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the [Constitution] . . . ." *Id.,* at 76. This departure from "traditional" rational-basis analysis with respect to sex-based classifications is clearly justified.

There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination.[13] Traditionally, such discrimination was rationalized by an attitude of "romantic paternalism" which, in practical effect, put women, not on a pedestal, but in a cage. Indeed, this paternalistic attitude became so firmly rooted in our national consciousness that, 100 years ago, a distinguished Member of this Court was able to proclaim:

> "Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and

---

[13] Indeed, the position of women in this country at its inception is reflected in the view expressed by Thomas Jefferson that women should be neither seen nor heard in society's decisionmaking councils. See M. Gruberg, Women in American Politics 4 (1968). See also 2 A. de Tocqueville, Democracy in America (Reeves trans. 1948).

independent career from that of her husband. . . . ". . . The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator." *Bradwell* v. *State,* 16 Wall. 130, 141 (1873) (Bradley, J., concurring).

As a result of notions such as these, our statute books gradually became laden with gross, stereotyped distinctions between the sexes and, indeed, throughout much of the 19th century the position of women in our society was, in many respects, comparable to that of blacks under the pre-Civil War slave codes. Neither slaves nor women could hold office, serve on juries, or bring suit in their own names, and married women traditionally were denied the legal capacity to hold or convey property or to serve as legal guardians of their own children. See generally L. Kanowitz, Women and the Law: The Unfinished Revolution 5–6 (1969); G. Myrdal, An American Dilemma 1073 (20th anniversary ed. 1962). And although blacks were guaranteed the right to vote in 1870, women were denied even that right—which is itself "preservative of other basic civil and political rights" [14]—until adoption of the Nineteenth Amendment half a century later.

It is true, of course, that the position of women in America has improved markedly in recent decades.[15]

---

[14] *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964); see *Dunn* v. *Blumstein,* 405 U. S. 330, 336 (1972); *Kramer* v. *Union Free School District,* 395 U. S. 621, 626 (1969); *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886).

[15] See generally The President's Task Force on Women's Rights and Responsibilities, A Matter of Simple Justice (1970); L. Kanowitz, Women and the Law: The Unfinished Revolution (1969); A. Montagu, Man's Most Dangerous Myth (4th ed. 1964); The President's Commission on the Status of Women, American Women (1963).

Nevertheless, it can hardly be doubted that, in part because of the high visibility of the sex characteristic,[16] women still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena.[17] See generally K. Amundsen, The Silenced Majority: Women and American Democracy (1971); The President's Task Force on Women's Rights and Responsibilities, A Matter of Simple Justice (1970).

Moreover, since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate "the basic concept of our system that legal burdens should bear some relationship to individual responsibility . . . ." *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 175 (1972). And what differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.[18] As a result, statutory distinc-

---

[16] See, *e. g.*, Note, Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendment?, 84 Harv. L. Rev. 1499, 1507 (1971).

[17] It is true, of course, that when viewed in the abstract, women do not constitute a small and powerless minority. Nevertheless, in part because of past discrimination, women are vastly underrepresented in this Nation's decisionmaking councils. There has never been a female President, nor a female member of this Court. Not a single woman presently sits in the United States Senate, and only 14 women hold seats in the House of Representatives. And, as appellants point out, this underrepresentation is present throughout all levels of our State and Federal Government. See Joint Reply Brief of Appellants and American Civil Liberties Union (*Amicus Curiae*) 9.

[18] See, *e. g.*, Developments in the Law—Equal Protection, 82 Harv. L. Rev. 1065, 1173–1174 (1969).

tions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members.

We might also note that, over the past decade, Congress has itself manifested an increasing sensitivity to sex-based classifications. In Tit. VII of the Civil Rights Act of 1964, for example, Congress expressly declared that no employer, labor union, or other organization subject to the provisions of the Act shall discriminate against any individual on the basis of "race, color, religion, *sex,* or national origin." [19] Similarly, the Equal Pay Act of 1963 provides that no employer covered by the Act "shall discriminate . . . between employees on the basis of *sex.*" [20] And § 1 of the Equal Rights Amendment, passed by Congress on March 22, 1972, and submitted to the legislatures of the States for ratification, declares that "[e]quality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex." [21] Thus, Congress itself has concluded that classifications based upon sex are inherently invidious, and this conclusion of a coequal

---

[19] 42 U. S. C. §§ 2000e–2 (a), (b), (c) (emphasis added). See generally, Sape & Hart, Title VII Reconsidered: The Equal Employment Opportunity Act of 1972, 40 Geo. Wash. L. Rev. 824 (1972); Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L. Rev. 1109 (1971).

[20] 29 U. S. C. § 206 (d) (emphasis added). See generally Murphy, Female Wage Discrimination: A Study of the Equal Pay Act 1963–1970, 39 U. Cin. L. Rev. 615 (1970).

[21] H. R. J. Res. No. 208, 92d Cong., 2d Sess. (1972). In conformity with these principles, Congress in recent years has amended various statutory schemes similar to those presently under consideration so as to eliminate the differential treatment of men and women. See 5 U. S. C. § 2108, as amended, 85 Stat. 644; 5 U. S. C. § 7152, as amended, 85 Stat. 644; 5 U. S. C. § 8341, as amended, 84 Stat. 1961; 38 U. S. C. § 102 (b), as amended, 86 Stat. 1092.

branch of Government is not without significance to the question presently under consideration. Cf. *Oregon* v. *Mitchell,* 400 U. S. 112, 240, 248–249 (1970) (opinion of BRENNAN, WHITE, and MARSHALL, JJ.); *Katzenbach* v. *Morgan,* 384 U. S. 641, 648–649 (1966).

With these considerations in mind, we can only conclude that classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny. Applying the analysis mandated by that stricter standard of review, it is clear that the statutory scheme now before us is constitutionally invalid.

### III

The sole basis of the classification established in the challenged statutes is the sex of the individuals involved. Thus, under 37 U. S. C. §§ 401, 403, and 10 U. S. C. §§ 1072, 1076, a female member of the uniformed services seeking to obtain housing and medical benefits for her spouse must prove his dependency in fact, whereas no such burden is imposed upon male members. In addition, the statutes operate so as to deny benefits to a female member, such as appellant Sharron Frontiero, who provides less than one-half of her spouse's support, while at the same time granting such benefits to a male member who likewise provides less than one-half of his spouse's support. Thus, to this extent at least, it may fairly be said that these statutes command "dissimilar treatment for men and women who are . . . similarly situated." *Reed* v. *Reed,* 404 U. S., at 77.

Moreover, the Government concedes that the differential treatment accorded men and women under these statutes serves no purpose other than mere "administrative convenience." In essence, the Government maintains that, as an empirical matter, wives in our society frequently are dependent upon their husbands, while hus-

bands rarely are dependent upon their wives. Thus, the Government argues that Congress might reasonably have concluded that it would be both cheaper and easier simply conclusively to presume that wives of male members are financially dependent upon their husbands, while burdening female members with the task of establishing dependency in fact.[22]

The Government offers no concrete evidence, however, tending to support its view that such differential treatment in fact saves the Government any money. In order to satisfy the demands of strict judicial scrutiny, the Government must demonstrate, for example, that it is actually cheaper to grant increased benefits with respect to *all* male members, than it is to determine which male members are in fact entitled to such benefits and to grant increased benefits only to those members whose wives actually meet the dependency requirement. Here, however, there is substantial evidence that, if put to the test, many of the wives of male members would fail to qualify for benefits.[23] And in light of the fact that the

---

[22] It should be noted that these statutes are not in any sense designed to rectify the effects of past discrimination against women. See *Gruenwald* v. *Gardner*, 390 F. 2d 591 (CA2), cert. denied, 393 U. S. 982 (1968); cf. *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968); *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966). On the contrary, these statutes seize upon a group—women—who have historically suffered discrimination in employment, and rely on the effects of this past discrimination as a justification for heaping on additional economic disadvantages. Cf. *Gaston County* v. *United States*, 395 U. S. 285, 296–297 (1969).

[23] In 1971, 43% of all women over the age of 16 were in the labor force, and 18% of all women worked full time 12 months per year. See U. S. Women's Bureau, Dept. of Labor, Highlights of Women's Employment & Education 1 (W. B. Pub. No. 72–191, Mar. 1972). Moreover, 41.5% of all married women are employed. See U. S. Bureau of Labor Statistics, Dept. of Labor, Work Experience of the Population in 1971, p. 4 (Summary Special Labor Force Report, Aug. 1972). It is also noteworthy that, while the median income of a

dependency determination with respect to the husbands of female members is presently made solely on the basis of affidavits, rather than through the more costly hearing process,[24] the Government's explanation of the statutory scheme is, to say the least, questionable.

In any case, our prior decisions make clear that, although efficacious administration of governmental programs is not without some importance, "the Constitution recognizes higher values than speed and efficiency." *Stanley* v. *Illinois,* 405 U. S. 645, 656 (1972). And when we enter the realm of "strict judicial scrutiny," there can be no doubt that "administrative convenience" is not a shibboleth, the mere recitation of which dictates constitutionality. See *Shapiro* v. *Thompson,* 394 U. S. 618 (1969); *Carrington* v. *Rash,* 380 U. S. 89 (1965). On the contrary, any statutory scheme which draws a sharp line between the sexes, *solely* for the purpose of achieving administrative convenience, necessarily commands "dissimilar treatment for men and women who are . . . similarly situated," and therefore involves the "very kind of arbitrary legislative choice forbidden by the [Constitution] . . . ." *Reed* v. *Reed,* 404 U. S., at 77, 76. We therefore conclude that, by according differential treatment to male and female members of the uniformed services for the sole purpose of achieving administrative

---

male member of the armed forces is approximately $3,686, see The Report of the President's Commission on an All-Volunteer Armed Force 51, 181 (1970), the median income for all women over the age of 14, including those who are not employed, is approximately $2,237. See Statistical Abstract of the United States Table No. 535 (1972), Source: U. S. Bureau of the Census, Current Population Reports, Series P–60, No. 80. Applying the statutory definition of "dependency" to these statistics, it appears that, in the "median" family, the wife of a male member must have personal expenses of approximately $4,474, or about 75% of the total family income, in order to qualify as a "dependent."

[24] Tr. of Oral Arg. 27–28.

convenience, the challenged statutes violate the Due Process Clause of the Fifth Amendment insofar as they require a female member to prove the dependency of her husband.[25]

*Reversed.*

MR. JUSTICE STEWART concurs in the judgment, agreeing that the statutes before us work an invidious discrimination in violation of the Constitution. *Reed* v. *Reed,* 404 U. S. 71.

MR. JUSTICE REHNQUIST dissents for the reasons stated by Judge Rives in his opinion for the District Court, *Frontiero* v. *Laird,* 341 F. Supp. 201 (1972).

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, concurring in the judgment.

I agree that the challenged statutes constitute an unconstitutional discrimination against servicewomen in violation of the Due Process Clause of the Fifth Amendment, but I cannot join the opinion of MR. JUSTICE BRENNAN, which would hold that all classifications based upon sex, "like classifications based upon race, alienage, and national origin," are "inherently suspect and must therefore be subjected to close judicial scrutiny." *Ante,* at 682. It is unnecessary for the Court in this case to

---

[25] As noted earlier, the basic purpose of these statutes was to provide fringe benefits to members of the uniformed services in order to establish a compensation pattern which would attract career personnel through re-enlistment. See n. 3, *supra,* and accompanying text. Our conclusion in no wise invalidates the statutory schemes except insofar as they require a female member to prove the dependency of her spouse. See *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164 (1972); *Levy* v. *Louisiana,* 391 U. S. 68 (1968); *Moritz* v. *Commissioner of Internal Revenue,* 469 F. 2d 466 (CA10 1972). See also 1 U. S. C. § 1.

characterize sex as a suspect classification, with all of the far-reaching implications of such a holding. *Reed* v. *Reed,* 404 U. S. 71 (1971), which abundantly supports our decision today, did not add sex to the narrowly limited group of classifications which are inherently suspect. In my view, we can and should decide this case on the authority of *Reed* and reserve for the future any expansion of its rationale.

There is another, and I find compelling, reason for deferring a general categorizing of sex classifications as invoking the strictest test of judicial scrutiny. The Equal Rights Amendment, which if adopted will resolve the substance of this precise question, has been approved by the Congress and submitted for ratification by the States. If this Amendment is duly adopted, it will represent the will of the people accomplished in the manner prescribed by the Constitution. By acting prematurely and unnecessarily, as I view it, the Court has assumed a decisional responsibility at the very time when state legislatures, functioning within the traditional democratic process, are debating the proposed Amendment. It seems to me that this reaching out to pre-empt by judicial action a major political decision which is currently in process of resolution does not reflect appropriate respect for duly prescribed legislative processes.

There are times when this Court, under our system, cannot avoid a constitutional decision on issues which normally should be resolved by the elected representatives of the people. But democratic institutions are weakened, and confidence in the restraint of the Court is impaired, when we appear unnecessarily to decide sensitive issues of broad social and political importance at the very time they are under consideration within the prescribed constitutional processes.