703 So.2d 1121 (1997)
Henry F. POHLMANN, III, Appellant/Cross-Appellee,
v.
Carol L. POHLMANN, Appellee/Cross-Appellant.
Nos. 96-1709, 96-2476.
District Court of Appeal of Florida, Fifth District.
November 14, 1997.
Rehearing Denied January 2, 1998.
*1122 David A. Sims of Doss & Sims, P.A., Altamonte Springs, for Appellant/Cross-Appellee.
*1123 Mel Pearlman of Mel Pearlman, P.A., Fern Park, for Appellee/Cross-Appellant.
PETERSON, Judge.
The former husband, Henry F. Pohlmann, III, appeals a final judgment denying modification of his child support obligations. He contends that the trial court erred by finding subsection 61.30(12), Florida Statutes (1995), constitutional, and by finding an absence of substantial change in circumstances that prevented a downward modification of child support. The former wife, Carol Greenwell, cross appeals the modification of a reimbursement provision requiring the former husband to pay 50% rather than 100% of medical expenses not covered by his medical insurance, and 50% rather than 100% of the amount of her attorney's fees.
The parties' settlement agreement incorporated in the final judgment of dissolution provided that the former husband would pay $550 per month in child support and 100% of the child's medical expenses not covered by insurance. Approximately two years after the dissolution, the parties modified their marital settlement agreement to require the former husband to pay accumulated unreimbursed medical bills and other arrearages by conveying securities to the former wife. The modification also required the former wife to submit medical expense bills to the former husband within six months, and if she failed to do so, he would be relieved from any further obligations for such expense. The modification, however, was never submitted to nor approved by the court.
In February 1995, the former husband petitioned for modification of child support alleging that there had been a substantial change in his financial circumstances warranting a downward modification of his child support obligation. The specific allegations included: (a) his income had decreased permanently, involuntarily and substantially, (b) the former wife's income had increased, (c) he had remarried and has three children from the subsequent marriage, (d) the former wife had remarried, and (e) it appeared the child support guidelines would provide for a decrease of $50 per month or 15% of the current amount. The trial court struck allegations (c) and (d), above. The former wife counter petitioned, alleging that the former husband had failed to honor the parties' settlement agreement by defaulting on his $550 per month child support obligation and by failing to reimburse her for uninsured medical expenses.
The former wife testified that at the time of the dissolution she had no income because she had been in the process of relocating back to Kentucky and that she required rehabilitative alimony in order to further her education and ultimately obtain a higher paying job. She testified that the former husband had failed to pay child support amounting to $4,000 and to reimburse her for medical expenses. At the time of the modification hearing she was employed and had net earnings of $1,600 per month.
The former husband testified he was self employed, but that his income had dropped considerably from the time of dissolution. He conceded on cross examination, however, that his available monthly income of $2,479 at the time of trial exceeded his available income at the time of dissolution. He admitted he was not meeting his child support obligations and was donating $260 per month to his church because he felt this obligation took priority over his duty to support his child. He also testified that the parties' marital settlement agreement contemplated that the former wife would relocate to Kentucky so that she could complete her education and ultimately return to work.
Shortly before the modification hearing, the former husband's current wife sought and obtained a child support order for the three children produced by their marriage. The current wife testified that although she and the former husband were experiencing marital difficulties that were financial in nature, they nonetheless continue to cohabit and she continues to have access to their joint bank account into which he deposits his income.
The trial court found that no substantial change in circumstances occurred that would warrant a downward modification in child support, that the former husband had willfully failed to maintain his child support *1124 obligation and owed $4,825 in child support arrearages, that he had willfully failed to reimburse $6,224.83 to the former wife for medical expenses, and that he and his current wife continue to live together in a marital relationship despite the entry of a final judgment for separate maintenance. The trial court also found that an income deduction order entered by another court to support the three children produced from the current marriage was subordinate and inferior to the income deduction order entered in favor of the child of the parties. The trial court, however, did modify the reimbursement provisions for medical expenses not covered by insurance, determining that as of November 28, 1995, each of the parties would be responsible for one-half of those expenses. Additionally, the former husband's summer visitation was increased from two weeks to six weeks. Finally, the former wife was awarded attorney's fees of $7,001.50, which represented only one half of the amount incurred.
We first address the former husband's argument that subsection 61.30(12) is unconstitutional. The subsection provides:
61.30 Child support guidelines.
* * * * * *
(12) A parent with a support obligation may have other children living with him or her who were born or adopted after the support obligation arose. The existence of such subsequent children should not as a general rule be considered by the court as a basis for disregarding the amount provided in the guidelines. The parent with a support obligation for subsequent children may raise the existence of such subsequent children as a justification for deviation from the guidelines. However, if the existence of such subsequent children is raised, the income of the other parent of the subsequent children shall be considered by the court in determining whether or not there is a basis for deviation from the guideline amount. The issue of subsequent children may only be raised in a proceeding for an upward modification of an existing award and may not be applied to justify a decrease in an existing award.

(Emphasis added). Section 61.30(12) prescribes a preference for a child under the protection of an existing child support order over any later born children of the payor parent. An obligor may raise the existence of subsequent children born after a support obligation arose as a circumstance affecting ability to pay only in a proceeding for an upward modification of an existing award. See Robinson v. Robinson, 657 So.2d 958 (Fla. 1st DCA 1995); Barrs v. Barrs, 590 So.2d 980 (Fla. 1st DCA 1991). The former husband contends that the distinction in subsection 61.30(12), between earlier and later born children unconstitutionally denies equal protection of the law to both parents of subsequent born children and to the subsequent children.
In analyzing the former husband's argument, we apply the rational basis standard of review because neither a suspect classification nor a fundamental right is involved. See Feltman v. Feltman, 434 N.W.2d 590 (S.D.1989) (court applied rational basis standard of review to non-custodial parent's claim that South Dakota statute violates the equal protection rights of children because the statute gives child support priority to the children of the first marriage); P.O.P.S. v. Gardner, 998 F.2d 764 (9th Cir. 1993) (children of noncustodial parents with support obligations to other children were not suspect class). Under the rational basis standard of review, a statute is presumed valid and will be upheld if the classification under the law bears some reasonable relationship to the achievement of a legitimate state purpose. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Haves v. City of Miami, 52 F.3d 918 (1995); Pinillos v. Cedars of Lebanon Hospital Corp., 403 So.2d 365 (Fla.1981); In re Greenberg's Estate, 390 So.2d 40 (Fla.1980), dism'd., 450 U.S. 961, 101 S.Ct. 1475, 67 L.Ed.2d 610 (1981). Contrary to the former husband's contention, we find that subsection 61.30(12) furthers a legitimate state interest and affirm the trial court's finding of constitutionality. The statute assures that noncustodial parents will continue to contribute to the support of their children from their first marriage notwithstanding their obligation to *1125 support children born during a subsequent marriage. Granting priority of child support to children of an earlier first marriage, the Feltman court determined that the South Dakota statute provided a fair and logical prioritization of claims against a noncustodial parent's income. Feltman at 592. "Without prioritization, the children from the first family might find their standard of living substantially decreased by the voluntary acts of a noncustodial parent. A noncustodial parent who elects to become responsible for supporting the children of a second marriage does so with the knowledge of a continuing responsibility to the children of the first marriage." Id.; see also Robinson at 960 (in construing § 61.30(12), court opined that It would appear that there was a legislative recognition that parties should be aware of their support obligation to existing children, and should take that into account prior to assuming further obligations).
We also affirm the trial court's finding that the former husband failed to show a substantial change of circumstances which would justify a downward modification of his support obligations. Court modification of a support agreement requires a party to show a permanent, involuntary, and substantial change in circumstances. Moreover, a noncustodial parent who agrees to the amount of child support, as the former husband did in the instant case, will face a heavier burden of proof to reduce such amount in a later modification proceeding. Tietig v. Boggs, 602 So.2d 1250 (Fla. 1992); Pimm v. Pimm, 601 So.2d 534 (Fla.1992). Both parties admitted that the marital agreement entered into, which incorporated the provisions for child support and reimbursement of medical expenses, contemplated the former wife relocating to Kentucky with the parties' minor child, attending college, and ultimately returning to work after obtaining her degree. The agreement also granted rehabilitative alimony for this purpose. The former husband further admitted that his available income at the time of trial exceeded his available income at the time of the dissolution, and that while he was not meeting his child support obligations, he was donating $260 per month to his church. In an attempt to manufacture a substantial change in circumstances, the former husband and his current wife produced the latter's petition for separate maintenance which tellingly was filed only two weeks before trial. The current wife testified that while she filed such petition in order to assure that her three children would be provided for, nothing in their marital relationship has changed. The trial court did not abuse its discretion in finding that the former husband failed to meet his burden of proving a permanent, involuntary, and substantial change in circumstances.
The original marital settlement agreement provided that the former husband would pay to the former wife 100% of the child's medical expenses not covered by his insurance. This arrangement was again confirmed in the parties' attempted 1991 modification, but was never submitted to the court for approval. In the instant action, the trial court modified the original agreement by placing equal responsibility on the parties for their child's medical expenses which were not covered by the former husband's medical insurance. Because the trial court found that there was no substantial change in circumstances which would justify a reduction in the former husband's child support obligation, it cannot at the same time modify the parties' arrangement regarding payment of medical expenses not covered by insurance. The former husband, however, may be due some relief in his support obligation based on the fact that the trial court increased his summer visitation from two to six weeks. See § 61.30(11)(g), Fla. Stat. (1995) ("if a child has visitation with a noncustodial parent for more than 28 consecutive days the court may reduce the amount of support paid to the custodial parent during the time of visitation not to exceed 50 percent of the amount awarded"). At the final hearing, the trial court indicated the former husband would be due some reduction for the increased visitation but the final judgment failed to include the adjustment. Upon remand, the trial court shall supplement its final order by addressing this issue.
Paragraph 22 of the parties' marital settlement agreement provides:

*1126 22. DEFAULT. In the event either party to the Agreement defaults in his or her obligations, the party in default shall be liable to the non-defaulting party for all reasonable expenses incurred in enforcement, specifically including attorneys' fees and costs....
We have doubts whether the trial court considered this provision. Instead, after "having considered the parties' relative financial positions," the trial court awarded the former wife only half of her attorney's fees. The former husband contends the above provision does not apply because the former wife is the defaulting party in that she failed to provide him with receipts of medical expenses within six months of such expenses as dictated by their 1991 supplemental agreement. As noted earlier, however, this supplemental agreement was never recognized by any court order, and accordingly has no effect on the parties' original agreement that the former husband will be responsible for reimbursement of all medical expenses not covered by his insurance. The former husband, the defaulting party in this action, is liable to the former wife, the non-defaulting party, for her reasonable attorney's fees and costs. However, we also recognize that other issues were considered in this action that were not based upon any default of the parties' marital agreement. Therefore, we conclude the trial court was not strictly bound by the provisions of the parties' settlement agreement. See Tucker v. Greenberg, 674 So.2d 807 (Fla. 5th DCA 1996) (issue of modification went beyond question of former wife's compliance with settlement agreement); Hughes v. Hughes, 553 So.2d 197 (Fla. 2d DCA 1987) (parties' settlement agreement "was not intended to reach proceedings to modify child support"). The trial court has already found the former wife's attorney's fees and costs to be reasonable, and we remand with instructions that the former wife receive an award of her attorney's fees and costs incurred on the issue of the breach of the parties' agreement. See Jacobson v. Jacobson, 595 So.2d 292 (Fla. 5th DCA 1992) (a trial court has no discretion to decline to enforce contractual provisions for award of prevailing party attorney fees any more than any other contractual provision). Any remaining fees may be allocated based upon section 61.16, Florida Statutes (1995).
We affirm the judgment of the trial court with the following exceptions:
1. The trial court's modification of the medical reimbursement provision set forth in the parties' original settlement agreement is reversed.
2. The award of attorney's fees to the former wife is reversed and we remand with instructions to award attorney's fees consistent with this opinion.
3. On remand, the trial court shall consider the possibility of decreasing the child support obligation of the former husband during the period of his extended visitation.
AFFIRMED in part; REVERSED in part; REMANDED.
GRIFFIN, C.J., concurs.
HARRIS, J., dissents, with opinion.
HARRIS, Judge, dissenting.
The issue in this case, quite simply, is whether it is a "legitimate government interest" for the State, through its legislative process, to prefer certain children over others. Because I believe that it is not, I would hold § 61.30(12), Florida Statutes, unconstitutional under the provisions of Article I, § 2, of the Florida Constitution.
The above cited constitutional provision states: "All natural persons are equal before the law...." Our supreme court has told us in unambiguous terms that "[m]inors are natural persons in the eyes of the law and `[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, ... possess constitutional rights.'" In re T.W., 551 So.2d 1186, 1193 (Fla.1989), quoting Planned Parenthood v. Danforth, 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976).
The majority opinion herein relies on Feltman v. Feltman, 434 N.W.2d 590 (S.D.1989), to support the constitutionality of a provision that attempts to protect the standard of living of children born before a parent's divorce at the expense of such parent's children born *1127 subsequent to the divorce by condemning the later children to a lesser standard of living (and possible abject poverty). Although Feltman did a good job in determining what the state's asserted interest was (to protect the standard of living of the children of the first marriage) and then in "rationally" relating the discriminatory provision to that interest, it failed miserably (and in fact, did not even try) to demonstrate that the state's expressed interest was indeed "a legitimate state interest." This is a requirement if state discrimination is to be upheld. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583, (1973).
The Feltman court acknowledges that the application of the South Dakota statute (substantially the same as ours) may result in the children of second marriages receiving a lesser amount of economic support than children of first marriages. But, says Feltman, such an outcome was considered by the Child Support Commission. It is our obligation, under the constitution of this state, to determine whether the state has the right under any circumstance (even if recommended by a commission) to discriminate between children born to the same parent. There is no doubt that if parents are required to support their children by a second marriage to the same extent that they must support their children from an earlier marriage, the standard of living of all of the children will be affected. But so too will the standard of living of the first-born child in an intact marriage be affected by the birth of the second child and this adjusted standard of living will be further affected by the birth of the third child and this adjusted standard of living will again be affected by the birth of the fourth child and so on. The living standard of children will always be affected when the parent's finite income is required to be shared with additional siblings. But each child should be able to expect that the law (the state) will not intervene in order to treat him or her unfairly in the allocation of the parent's income which is available for support. If the court so intervenes, the children of the second marriage will see the court as the neighborhood bully who steals their candy to give to their half-siblings. The fact of a divorce should not be justification for the state to prefer some of the siblings over others. It is not appropriate for the state to punish the children of a second marriage because their parent was involved in a previous divorce.
Although the state should not involve itself with the divorced parent's decision regarding remarriage, our statute is designed to discourage a parent from having a second family unless he or she is willing to support the second family at a lesser standard. But even though the statute is not an exercise of legitimate state interest, since it is presumed that the parent is aware of this provision it is not as unfair to enforce the provisions of the statute against the parent in the event of a second family as it is to enforce it against the children born of the second marriage. At least the parent has assumed the risk of state discrimination. But the children of the later marriage were not aware of the statutory provision nor did they consent to be born into state-mandated poverty. The United States Supreme Court,[1] in considering whether a state could refuse to educate the children of illegal immigrants, rejected the state's effort:
Even if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice. "[V]isiting... condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the ... child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the ... child is an ineffectualas well as unjustway of deterring the parent." (Citation omitted).
Throughout this discussion, we should keep in mind that we are not here dealing with state funds. The state is mandating a disproportionate allocation of the parent's income. It is demanding that parents, from *1128 their income, support some of their children better than they support the others. And the state is wrong. The state does have a legitimate interest in seeing that a noncustodial parent does not discriminate against the children of the first marriage by supporting them at a lesser level than subsequently born children in that parent's custody. And in supplying this protection, the court should consider not only any additional income earned by the parent since the divorce but also any support contribution that might be made by the new spouse. But the state should not attempt to meet this obligation, as it has by this statute, by throwing the subsequent children to the wolves. The state's current approach is Cinderellianit makes noncustodial parents appear as wicked stepparents to their own children by requiring them to provide new ball gowns for their first born while supplying hand-me-downs to their later children.
The dissent in Feltman asks the question: "Are the children of a second marriage children of a lesser god'?" It also asks whether such children are lesser under the United States Constitution; are they less hungry or less naked without their parent's support? It finally asks whether we should weep for the children of a second marriage when they are born instead of when they die? The dissent in Feltman's response to these questions is that all children of the parent should be considered equal. The dissent asserts, as do I, that the mere fact that discrimination is in the guidelines or in the statute does not make it right, nor does it make it constitutional. Nor does the fact that it is designed by some committee make it so.
Even though it is a discomforting topic, perhaps we should consider the fairness issue. Suppose it were the mother who was required to pay support to the children of her first marriage. And assume that upon remarriage she elects to have additional children. By doing so, she has voluntarily become unemployed rendering further child support problematic. Assume further that she elects to become a stay-at-home mother to raise her new children. The court would not, could not, and should not intervene. And there is a good reason. The children of the first marriage simply have no more veto power over the noncustodial parent's future reproductive decisions than a child of an intact marriage has over his parents' decision to have additional children. And such children of the first marriage, at least in my view, have no vested right to a higher standard of living based on an allocation of a greater percentage of their parent's income than do the children of a second marriage.
Because the state has no business discriminating between children based solely on the fact of a divorce, there is no legitimate state purpose in requiring a parent to allocate his or her income more to one child than another. The state's attempt to do so is state-mandated, court-enforced child abuse; it is not only cruel discrimination, it is unconstitutional.
NOTES
[1] Plyler v. Doe, 457 U.S. 202, 220, 102 S.Ct. 2382, 2396, 72 L.Ed.2d 786 (U.S.Tex.1982), rehearing denied, 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982).