HARTZ, Circuit Judge, dissenting:
The Supreme Court has been at the forefront of the march for gender equality. But it has never suggested that men and women are identical or that the law cannot recognize their inherent differences. On the contrary, in United States v. Virginia , 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), it wrote: " 'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration ...." That pronouncement should, at the least, cause one to pause before expanding Supreme Court equal-protection doctrine that has been applied in wholly different contexts so that it encompasses laws founded on notions of the erotic, particularly when the distinctions in the law are directly based on inherent biological, morphological differences between men and women. The case before us concerns such a law.
Let me begin by stating what I believe to be common ground. A fundamental precept of equal-protection doctrine is that each person should be judged as an individual, not as a member of a group. The law cannot treat the genders differently when there is no relevant difference between them. No reasonable person now believes that men and women differ in their talents and performances as, say, lawyers, so discrimination in licensure cannot be tolerated. But even if there are relevant differences, those differences cannot justify differences in treatment unless there is a very good reason not to use gender-neutral criteria. In particular, gender discrimination cannot be justified simply by significant disparities between the *808 bell curves showing the distribution of a specific talent or capacity or preference within each of the two groups. Even if women are, on average, substantially weaker than men, that is no reason to automatically disqualify a woman from a job that requires more strength than that possessed by the average woman. If an individual woman can satisfy the strength requirements, it is irrelevant that most women could not. Even if men are, on average, less interested in nurturing than women are, that is no reason to disqualify a man from a nursing position. After a divorce, custody of the children should depend on the specific qualities of the parents, not their genders. In these cases, the equal-protection problem is cured by requiring the use of gender-neutral language-language that focuses on the pertinent criteria rather than stereotypes about a particular gender. See Sessions v. Morales-Santana , --- U.S. ----, 137 S.Ct. 1678, 1693 n.13, 198 L.Ed.2d 150 (2017) ("Even if stereotypes frozen into legislation have 'statistical support,' our decisions reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn.").
Thus, the Supreme Court has invalidated numerous laws treating males and females differently because the laws violated the Equal Protection Clause of the Fourteenth Amendment (or the equivalent doctrine under the Due Process Clause of the Fifth Amendment). The most recent, Morales-Santana , 137 S.Ct. 1678, concerned a statute under which a child born abroad to unmarried parents, one of whom was a United States citizen, could qualify for citizenship if the citizen parent was a mother with one year of continuous physical presence in the United States, but required a citizen parent who was the father to have five years of continuous presence. Nevada Department of Human Resources v. Hibbs , 538 U.S. 721, 726-40, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003), concerned gender discrimination in family leave. United States v. Virginia , 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), invalidated the exclusion of women from the Virginia Military Institute. J.E.B. v. Alabama ex rel. T.B ., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), invalidated gender discrimination in using peremptory strikes in jury selection. Mississippi University for Women v. Hogan , 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), invalidated the exclusion of males from the nursing school at the State's sole single-sex university. Kirchberg v. Feenstra , 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981), invalidated a statute that granted only husbands the right to manage and dispose of jointly owned property without the spouse's consent. Wengler v. Druggists Mutual Ins. Co. , 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980), invalidated a statute requiring a widower, but not a widow, to show he was incapacitated from earning a wage in order to recover benefits for a spouse's death under workers' compensation laws. Orr v. Orr , 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), invalidated a statute providing that only men could be ordered to pay alimony following divorce. Craig v. Boren , 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), invalidated a statute allowing women to purchase "nonintoxicating" beer at a younger age than could men. Stanton v. Stanton , 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), invalidated a statute providing that women reached legal majority at an earlier age than did men. Weinberger v. Wiesenfeld , 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), invalidated a statute providing that widows, but not widowers, could collect survivors' benefits under the Social Security Act.
*809 Frontiero v. Richardson , 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), prohibited basing the determination of a spouse's dependency on the gender of the member of the Armed Forces claiming dependency benefits. And Reed v. Reed , 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), invalidated a statute that preferred men to women as administrators of estates.
In the above decisions the Supreme Court applied (although only implicitly in the earlier cases) "heightened scrutiny," which requires "an exceedingly persuasive justification" for the gender-based treatment. Morales-Santana , 137 S.Ct. at 1690 (internal quotation marks omitted). Such scrutiny was appropriate because in each case the underlying rationale for the legal distinction in the treatment of the two genders was part of the long history of "overbroad generalizations about the different talents, capacities, or preferences of males and females." Virginia , 518 U.S. at 533, 116 S.Ct. 2264 ; see J.E.B ., 511 U.S. at 135-36, 114 S.Ct. 1419. The invalidated laws were predicated on stereotypes under which every member of a gender was treated as having a talent, capacity, or preference that most members of the gender have or were perceived as having.
The Fort Collins indecency ordinance (the Ordinance) is not such a law. It is part of a long tradition of laws prohibiting public indecency-the public display of portions of the anatomy that are perceived as particularly erotic or serve an excretory function. These laws may be justified as reducing or preventing antisocial behavior caused by indecent exposure: offensive behavior ranging from assault to corruption of youth to simply distraction from productive activity. The Ordinance does not discriminate against women on the basis of any overbroad generalization about their perceived "talents, capacities, or preferences." To the extent it distinguishes between the sexes, it is based on inherent biological, morphological differences between them. Those differences are not stereotypes. They are not statistical differences, they are not matters of degree. They are differences in anatomical structure that reflect the unique biological roles played by males and females. (Plaintiffs' "evidence" that the breasts of men and women are essentially identical cannot be taken seriously.) We are not dealing here with a "simplistic, outdated assumption that gender could be used as a proxy for other, more germane bases of classification." Mississippi University for Women , 458 U.S. at 726, 102 S.Ct. 3331 (internal quotation marks omitted).
And, to go back to first principles in equal-protection jurisprudence, there is nothing inherently invidious to an adult of either gender in declaring that an inherent biological, morphological feature of his or her body is erotic. That view would be inconsistent with the fundamental role of sexual attraction in our most revered social institution-marriage; to believe that a spouse is sexually attractive is not to demean the spouse. I do not think the Supreme Court has embraced the view that it is.
In this light, it is apparent that the rationales supporting heightened scrutiny of gender discrimination have no purchase in the context of indecency laws based on inherent biological, morphological differences between the sexes. The proper standard of review is the rational-basis standard generally applied to economic and social regulation. One might argue that any departure from heightened scrutiny poses a danger that the tools for ending gender discrimination will be weakened in future cases. In my view, however, the danger is the contrary. As I shall explain below, attempts to treat the above-described type of regulation under a heightened-scrutiny standard pose a significant *810 risk that the standard will be weakened, thereby endangering the power of equal-protection doctrine to control gender discrimination.
Plaintiffs' arguments against the Ordinance are founded on the contention that it is predicated on a distorted view of the erotic nature of the female breast that has been imposed by an anti-female culture. Although one can debate about how much of our society's view of the female breast is cultural and how much is biological (instinctual), the argument is certainly one that can be presented to a court. But it is not an argument like those in disputes that the Supreme Court has reviewed under heightened scrutiny-equal-protection cases that challenge the notion that males, or females, are not good at certain tasks or worthy of a benefit because of their inherent talents, capacities, or preferences. And resolution of the argument will, at least for the time being and the foreseeable future, depend on unproved theories (by, say, neurologists, evolutionary biologists, psychologists, and sociologists), rather than on everyday observations of what people are doing.
Further, even if notions of the erotic are purely culturally based, it is unclear why that is relevant to the validity of indecency laws. The purpose of those laws is to reduce antisocial behavior. Such laws must deal with the real world. Legislation itself is rational even if the behavior it attempts to control is irrational (such as sexual assault purportedly caused by objectification of the female body). What would be the state of society if legislation could control only rational behavior? A regulation designed to reduce the antisocial effects of irrational thinking does not constitute an endorsement of that irrational thinking. Are laws regulating pornography and obscenity invalid if the societal harms they are intended to prevent are caused by cultural influences rather than purely biological ones? The only assumption about men and women underlying the Ordinance is that because of the erotic potential of female breasts, their public exposure will induce misconduct.
The psychological theory underlying Plaintiffs' concerns is objectification theory. As I understand the theory, its concern is not with loving, respectful relationships in which the female breast has an erotic role. Rather, its concern is that our culture has come to objectify the female body, divorcing it from the human being to which it belongs, and valuing the woman primarily as just a body (or collection of body parts) to be used or consumed by others. In other words, women are treated as sex objects. The media may not be the sole cause, but advertisements and entertainment thrust this culture on the public. The harmful consequences are multiple and severe. The effect on men is that they mistreat women, from engaging in sexual assault to belittling their talents. The effect on women is more insidious. Many internalize the objectification they experience, causing them to obsess about their appearance and to suffer severe damage to their self-image and mental health-with consequences to their educational attainment, jobs, etc. This damage is not caused by the women themselves; they do not wish their bodies to be objectified. Objectification is imposed on them by society. Plaintiffs oppose such objectification and the sources (such as advertisements and entertainment media) that fuel it. They believe that permitting women to publicly bare their breasts will educate the public that the female breast need not be treated as a sexual object and thereby help reduce objectification and the damage it causes. The Ordinance, in their view, promotes objectification by assuming that the female breast is necessarily erotic and therefore compelling it to be covered.
*811 Perhaps the theory is sound and Plaintiffs' approach will improve the treatment of women. But others could believe that a different approach is preferable, even if they endorse objectification theory. Some might think that the purposes of the Ordinance are very much in tune with Plaintiffs' concerns. The purposes expressed in support of the Ordinance can be characterized as preventing just the sort of antisocial conduct that purportedly can arise from "objectifying" the female breast: misconduct by some people caused by their treating the female breast (and the woman) as a sex object and exposure of children to breasts that are treated as sex objects. After all, it appears to be an essential premise of objectification theory that the woman whose body (breast) is objectified is not the one who controls that objectification. It is other people who objectify her body. When Plaintiffs publicly bare their breasts, even in a nonsexual manner with the purpose of conveying that there is nothing necessarily "sexy" about them, they cannot determine how others will view their breasts. Under objectification theory it is the response of others to the female breast, not the woman's personal intent, that drives objectification. Some, perhaps most, may react to Plaintiffs in a way that treats their breasts as sex objects. Indeed, an article co-authored by Plaintiffs' expert, Professor Tomi-Ann Roberts, cited research showing that sexual objectification is most likely in "public, mixed-gender, unstructured" spaces-just where Plaintiffs wish to appear topless. Fredrickson & Roberts, Objectification Theory, 21 Psychology of Women Quarterly 173, 197 (1997).[1] How does it help children grow up well-adjusted to expose them to such exchanges in the public square? See Aplt. App. Vol. III at 203-05 (testimony by Professor Roberts, agreeing that "a child having exposure to a sexualized female breast might be harmful or negative to that child," stating that "the massive exposure to sexualized female breasts that children are made aware of-that is something that should be controlled," and agreeing that "when this information that children are being exposed to is sexualized, it's bad; but when it's nonsexualized, it's either neutral or good."). And even if Plaintiffs' public displays have the desired effect, others may take advantage of the opportunity to publicly display their breasts in a manner that promotes objectification without crossing the line into lewdness prohibited by other statutes.
I do not presume to resolve these issues. But I think it fair to say that they do not raise the sorts of questions that lend themselves to review under the heightened scrutiny demanded by Plaintiffs. The "exceedingly persuasive justification" standard is a poor tool, probably an unworkable one, for assessing the propriety, the constitutionality, of public-indecency laws. These laws are justified as promoting public order, quality-of-life, and morality. In evaluating these laws, we therefore must ask whether those purposes are served. The parties, the district court, and the panel majority have all examined whether the Ordinance can be justified on the ground that it prevents societal harms by maintaining public order, promoting traffic safety, and shielding children from psychological harm. These issues have not been relevant in Supreme Court gender-discrimination *812 cases, where the focus of the Court has been on the individual being discriminated against and the question is whether that individual's gender necessarily precludes him or her from having the "talents, capacities, or preferences" required for the benefit. Virginia , 518 U.S. at 533, 116 S.Ct. 2264.
Under heightened scrutiny, a distinction between the genders can be justified only by "exceedingly persuasive" evidence. Morales-Santana , 137 S.Ct. at 1690 (internal quotation marks omitted). So how could a government prove that an indecency law accomplishes its purpose? We can begin with laws prohibiting total nudity in public. Perhaps they are enacted solely for aesthetic reasons; but I suspect they are also justified as protecting public order, improving the quality of life, and preventing improper influences on the young. Yet it is hard to see how any such law could be upheld if compelling empirical data is required. What does one use as a control group (a society where public nudity is common)-some small isolated community? Legislators, and the public they respond to, must rely on intuitions-intuitions supported by millennia of traditions in our society. One could say that these traditions are merely cultural. But, contrary to some modern thought, that is not necessarily a stigma. One can recognize that our culture has been disgraced by discrimination, particularly racial, religious, and gender discrimination, and still recognize the good that has been provided by other components of that culture. In any event, my point is that this is not a matter that can be proved under the standards of heightened scrutiny.
The difficulty of obtaining probative evidence does not significantly diminish when one considers where to draw the line regarding the minimal amount of clothing required. Should any exposure of the buttocks whatsoever be prohibited? What sort of coverage of the genitalia is required? How much of the female breast can be exposed, and in what context? (For example, nursing in public, which is recognized by the Ordinance as an exception to the general prohibition, may have minimal erotic effect on others because of the context, although the exception might be justified simply because of the strong public interest in permitting nursing.) There are two particular difficulties. One, again, is the difficulty of finding a control group. If the issue is whether any harm would flow from eliminating any prohibition on women fully exposing their breasts, we would need an example of where such public exposure is common. It is not enough to find a place where no law prohibits such exposure if exposure is still rare.[2] Any effect of rare events is likely to be undetectable in the data. Another difficulty is measuring long-term effects. In particular, if there is psychological damage to children, that may not surface for a long time.[3] And when it *813 does surface, the children may not live in the community that serves as a control group. Cf. FCC v. Fox Television Stations, Inc. , 556 U.S. 502, 519, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) ("There are some propositions for which scant empirical evidence can be marshaled, and the harmful effect of broadcast profanity on children is one of them. One cannot demand a multiyear controlled study, in which some children are intentionally exposed to indecent broadcasts (and insulated from all other indecency), and others are shielded from all indecency.")
The testimony of Plaintiffs' expert, Professor Roberts, is relevant here. She acknowledged that "there isn't any data on whether or not allowing female toplessness or not allowing female toplessness impacts the process of self-objectification one way or the other." Aplt. App. Vol. III at 212. The only study she referred to as supporting her views regarding public toplessness was an 18-year longitudinal study of 200 children in California of European-American descent. See Paul Okami, Ph.D., et al., Early Childhood Exposure to Parental Nudity and Scenes of Parental Sexuality ("Primal Scenes"): An 18-Year Longitudinal Study of Outcome, Archives of Sexual Behavior , Vol. 27, No. 4, 361, 367 (1998). The study indicated various psychological benefits, and no negative effects, on children exposed to parental nudity in their early years (and reported positive results for males and mixed results for females from having watched their parents having sex). Professor Roberts said nothing about the study ever having been replicated. But even on its own terms, it would show only the desirability of exposing children to nudity in the home-an environment where objectification can presumably be excluded. (It is interesting that the professor did not argue that the study supports public nudity, as opposed to just toplessness. She volunteered in her testimony that "[g]enitals should be covered," Aplt. App. Vol. III at 218, without explaining how that is consistent with the study.) As I understand the professor's testimony, she thinks that it is harmful to women when the female breast is "objectified" as an object of sexual desire, but not when it is displayed but not objectified. She did not explain, however, how a parent taking a child to a public place can be confident that the exposed breasts of a woman in that place will not be so objectified, either by the woman herself or by the responses of onlookers. It would not be unreasonable to think that the city ordinance actually protects children from witnessing the objectification of the female breast.
To recap the salient reasons why the rationales for heightened scrutiny do not apply here: (1) the breast of the mature female is anatomically different from the male breast; (2) to say that the female breast has erotic potential is not invidious to women and is not a stereotype, certainly not an overbroad generalization about the talents, capacities, or preferences of women; (3) courts cannot determine with any degree of confidence whether erotic potential is biological (instinctual) or cultural, and the issue is of questionable relevance anyway; (4) a law restricting the public display of the mature female breast need not be predicated on the notion that the mature female breast is nothing more than a sex object; and (5) societal harm from public eroticism (including objectification of the female body) often does not readily lend itself to objective proof. This is not to say that the Ordinance is a wise law, or *814 even a rational one, a matter on which future research may be enlightening. I express no view on that. I do believe, however, that in this context, courts must exercise some humility. We should not run with the latest psychological or sociological study and override legislative judgments without the most careful consideration.
I recognize that a number of courts, almost all that have considered the issue, have upheld against equal-protection challenges various indecency laws prohibiting women from exposing their breasts on the ground that they survive heightened scrutiny. See Kimberly J. Winbush, J.D., Regulation of exposure of female, but not male, breasts , 67 A.L.R. 5th 431 (originally published in 1999) (collecting cases). But I am reluctant to follow that lead. Because of the difficulty of obtaining proof of the effects of indecency, I question whether the evidence supporting the laws provides "an exceedingly persuasive justification" for them. It would be unfortunate if by upholding indecency laws, the courts weaken the scrutiny applied to laws that truly do discriminate against women on the basis of their perceived "talents, capacities, or preferences."
Finally, because the Fort Collins ordinance should be subjected only to rational-basis review, I would reverse the grant of the preliminary injunction and remand for further proceedings. I therefore respectfully dissent.

The full text states: "[S]exual objectification is unlikely to affect any woman all the time. The extent to which particular social contexts accentuate a woman's awareness of actual or potential observers' perspectives on her body will, in part, predict the degree and kind of negative repercussions that she may experience. Sociological research has shown that it is in certain spaces-namely public, mixed-gender, unstructured ones-that women's bodies are most subject to evaluative commentary by others."

The panel opinion suggests that the apparent infrequency of the most problematic types of public toplessness (downtown or at swimming pools or outside schools) in communities that do not prohibit the practice is a constitutional argument against the Ordinance. See Maj. Op. at 803. But even if the harm is limited by the infrequency of the practice, I do not see why the city cannot try to prevent even that harm, or why it must await more significant harm before it can prohibit the practice. The usual criticism of government is it makes no effort to prevent a problem until the problem is advanced.

It does not appear that Plaintiffs challenge the general proposition that exposing children to nudity or female toplessness can be psychologically damaging. See, e.g., Ginsberg v. State of New York , 390 U.S. 629, 641-43, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (affirming against First Amendment challenge a statute that restricts sale of obscene material to minors that could not be prohibited with respect to adults). As I understand them, their objection to exposure, however, would be only when the context of the nudity or toplessness promotes objectification.