Opinión de conformidad emitida por el
Juez Asociado Se-ñor Kolthoff Caraballo.
En ocasiones hemos cambiado el cauce natural de un río para luego sufrir su justa rebelión. ¿No hubiera sido mejor detenernos reflexivamente en su ribera y aceptar la sabi-duría de su Creación?(1)
*913 La controversia en el caso de autos en realidad se reduce a lo siguiente: ¿permite nuestro ordenamiento legal que una criatura tenga, en lugar de un papá y una mamá, dos mamás regístrales? ¿Puede la figura legal del padre, en el estado de derecho actual, ser sustituida en el Registro Demográfico por la de una segunda madre —una “madre funcional”— con todas las implicaciones legales que esto conlleva? Conforme con el Art. 138 del Código Civil, 31 L.P.R.A. sec. 539, la contestación a estas preguntas es que tal pretensión está vedada.
I — i

El estatuto en cuestión

El Art. 138 del Código Civil, supra, dispone de manera taxativa que para que la madre legal de una criatura —que no cuenta con una filiación paterna en el Registro Demo-gráfico— pueda seguir siéndolo después de que su hijo o hija sea adoptada por otra persona, esa otra persona tiene que ser de “distinto sexo al del padre o la madre que lo ha reconocido como su hijo”. Por lo tanto, ya sea que la “fami-lia anterior” a la que se refiere este artículo exista, o no hubiera existido nunca para efectos de la vida del adop-tando, lo que sí expresó con prístina claridad el legislador es su intención de que el padre o la madre registral que subsiste sea del sexo opuesto al de la persona que adopta.
Ante esta realidad legal, argumenta la peticionaria, y así también concluye la opinión disidente de la distinguida Juez Asociada Señora Rodríguez Rodríguez, que el Art. 138, supra, sufre de inconstitucionalidad porque discri-mina por razón de sexo. Esto, en violación al principio constitucional que exige la igual protección de las leyes para todos los ciudadanos. Al sostener tal conclusión se-ñala la compañera Juez Asociada Rodríguez Rodríguez, que “[e]l discrimen por razón de género constituye un dis-crimen por razón de sexo porque las clasificaciones relacio- *914 nadas con el género se establecen, necesariamente, en re-lación con el sexo de la persona”.(2) Para ilustrar el punto, la opinión disidente cita la explicación que en torno al tema ofrece el Dr. Andrew Koppelman, para concluir que el discrimen de género es equivalente o está comprendido dentro de la clasificación de discrimen por sexo. La cita es la siguiente:
“As a matter of definition, if the same conduct is prohibited or stigmatized when engaged in by a person of one sex, while it is tolerated when engaged in by a person of other sex, then the party imposing the prohibition or stigma is discriminating on the basis of sex... If a business fires Ricky, or if the state prosecutes him, because of his sexual activities with Fred, while these actions would not be taken against Lucy if she did exactly the same things with Fred, then Ricky is being discriminated against because of his sex. If Lucy is permitted to marry Fred, but Ricky may not marry Fred, then (assuming that Fred would be a desirable spouse for either) Ricky is being discriminated against because of his sex”. Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1044.
En primer lugar, es claro que para que la definición del doctor Koppelman aplique —en el contexto del ejemplo que él mismo propone— la persona víctima del alegado discri-men está obligada a obviar su sexo mediante sus actos o preferencias sexuales. Esto es, la persona tiene que sentir o actuar en cuanto a su preferencia u orientación sexual de una manera distinta a lo que in rerum natura es su sexo; el sexo con el cual fue inscrito en el Registro Demográfico. De modo que el asunto no es el sexo de la persona, sino sus actos o sentires que obran —sin juzgar su corrección— de forma contraria a la naturaleza de las cosas.
En segundo lugar, y como se ilustra en el ejemplo antes reseñado, ciertamente el “discrimen por razón de sexo” —esto es, imponerle cargas o negarle beneficios a una persona, mientras no se le imponen esas mismas cargas o se le *915 niegan esos mismos beneficios a otra que se encuentra en las mismas condiciones, por el solo hecho de tener un sexo distinto— requiere precisamente que el discriminado sea de un sexo distinto al que se alega que es favorecido. Sin embargo, obsérvese que en el ejemplo del doctor Koppel-man, “Ricky” pretende reclamar discrimen por razón de sexo, pero no por pertenecer al grupo alegadamente discri-minado (masculino), sino porque, perteneciendo a ese grupo, piensa y actúa distinto a este. Nótese que si Lucy pretendiera hacer lo mismo que Ricky, esto es, casarse con otra dama, tampoco se lo permitirían. De manera que Ricky no puede alegar que lo que no le permiten a él por ser varón, sí se lo permiten a Lucy quien es mujer.
Por otro lado, Ricky tampoco reclama pertenecer a un “tercer sexo”, pues tal grupo, por la naturaleza de las co-sas, no existe.(3) De manera que lo que Ricky está alegando es que es discriminado por lo que él afirma es su orienta-ción sexual. Como es evidente entonces, “sexo” —en el sen-tido cromosómico— y “preferencia u orientación sexual” no siempre corresponden el uno al otro conforme al concepto general de las cosas, sino que pueden estar —sin adentrar-nos en juicios valorativos— disociados en el sentir o la psi-quis de un ser humano.
II

Aspecto constitucional

Ahora bien, desde el punto de vista constitucional, el sexo de una persona, al igual que la raza y el origen, son características inmutables determinadas únicamente por *916 el mero hecho de haber nacido con ellas.(4) Por eso, la im-posición de condiciones especiales a una persona mera-mente por su sexo sería violatorio del principio básico de nuestro sistema jurídico de que las cargas legales que im-pone el Estado deben tener alguna relación con la respon-sabilidad que se le da al individuo.(5) Es ante esa realidad, y como ya adelanté, que se ha buscado establecer una nueva clasificación de discrimen que, al definirla, resulta ser más amplia que la clasificación de discrimen por razón de sexo. A saber, el “discrimen por razón de género”.
Así pues, el Informe de la Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico define el concepto “género” como “la cons-trucción histórico-social que se ha hecho de las caracterís-ticas que se consideran definitorias de las mujeres y de los hombres y de los comportamientos esperados de unas y de otros en nuestra sociedad”.(6) Ahora bien, lo pertinente con relación a esta definición es que, al describirse como una construcción social y cultural que se produce histórica-mente, el concepto “género”, por ser un fenómeno social, se puede transformar. O sea, puede ser dinámico y mutable, conforme a la sociedad que lo construye. En ese sentido, mientras el sexo de una persona es un estado biológico y permanente,(7) el género es la manera en que la persona se identifica a sí misma con relación a la sociedad que la rodea. Por eso, en conformidad con este enfoque, es perfec-tamente aceptable socialmente hablando el que una persona se defina a sí misma, en su preferencia u orientación *917 sexual, como atraída sexualmente por otra persona de su propio sexo.(8)
En el caso de autos la peticionaria reclama que el Art. 138, supra, establece una clasificación por sexo, género y orientación sexual. Por lo que ya hemos visto, es claro que con relación a la clasificación de discrimen por “razón de sexo”, en su sentido puro y conforme a lo que histórica-mente ha comprendido tal concepto en nuestra jurisdic-ción, la peticionaria no encuentra apoyo constitucional.(9)
Por otro lado, si concluimos que el “discrimen por géne-ro” u “orientación sexual” se manifiestan, no en virtud de una característica inmutable, sino a base del concepto o la definición que la persona tiene de sí misma y su socializa-ción, entonces es menester, desde el punto de vista de her-menéutica jurídica, analizar si tales concepciones se pue-den subsumir —como reclama la peticionaria— en el concepto “discrimen por sexo” que establece nuestra Constitución. Sólo así pudiera, conforme a la extensa nor-mativa desarrollada a través de los años por esta Curia, encontrar refugio en el principio de igual protección de las leyes que establece el Art. II, Sec. 7 de nuestra Ley Su-prema, Const. E.L.A., L.P.R.A., Tomo 1. Veamos.
Nuestra Carta de Derechos establece en su Art. II, Sec. 1, que
[l]a dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos prin- *918 cipios de esencial igualdad humana.(10)
En instancias en que se impugna la validez de un esta-tuto por ser violatorio de la cláusula de igual protección de las leyes, es menester identificar si al legislar el Estado ha establecido una clasificación que pudiera comprenderse en-tre las sospechosas, o que existe un derecho fundamental que sea soslayado por la acción estatal.(11) Como vemos, en Puerto Rico las clasificaciones sospechosas están expresa-mente enumeradas en la Sec. 1 del Art. II de nuestra Cons-titución, supra, a saber: raza, color, sexo, nacimiento, ori-gen o condición social, ideas políticas, ideas religiosas o nacionalidad. (12) “Prima facie, la clasificación que alega la parte... [peticionaria] no se fundamenta en ninguna de las prohibiciones comprendidas en la antedicha sección”.(13)
Ahora bien, concluye la opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, que “el discrimen por razón de género [es] una modalidad del discrimen por razón de sexo”.(14) Sin embargo, nótese que, como hemos advertido, el concepto “género” no goza de la característica de “inmutabilidad” tan propia o distintiva del concepto “sexo”, cualidad que también poseen otras clasificaciones establecidas por nuestra Constitución, como son la raza, el color y el nacimiento. Es por lo anterior que respetuosa-mente difiero de la conclusión de que el discrimen por ra-zón de género es una modalidad del discrimen por razón de sexo. Me explico.
Ciertamente y como bien concluye la compañera Juez Asociada Señora Rodríguez Rodríguez, el concepto discri-men por razón de género, o más bien, por preferencia u *919 orientación sexual, conforme se ha esbozado, presenta una clara relación con el sexo de la persona. Sin embargo —en lo que tal vez es una interesante paradoja— resulta cardinal el hecho de que, aunque el sexo es un elemento indispensable de la orientación sexual, ambos son conceptos to-talmente distintos en su naturaleza y manifestación. Nótese que, mientras el discrimen por razón de sexo obra meramente en virtud de lo que soy biológicamente —varón o hembra — , el discrimen motivado por la preferencia u orientación sexual opera en razón de lo que pienso y acciono. Uno se manifiesta en razón de lo físico, de lo evi-dente, de lo inmutable y en total pasividad, mientras el otro surge como oposición a aquello que es abstracto, pero que se evidencia en la acción.
Por otro lado, los términos “género” u “orientación sexual” tampoco se encuentran expresamente mencionados entre aquellas clasificaciones de nuestra Constitución que obedecen meramente al lugar de donde provengo, la nacio-nalidad que ostento, o el estrato social o socioeconómico al que pertenezco. A saber, “origen, nacionalidad o condición social”.
Sin embargo, lo que resulta a mi juicio más concluyente es el hecho de que el texto de la Constitución tampoco in-cluye de manera alguna los términos “género” u “orienta-ción sexual” entre el grupo de aquellas clasificaciones que sí son afines a su naturaleza. Me refiero a las clasificacio-nes de “ideas políticas o religiosas”. Notemos que estas son clasificaciones que, como el concepto “género” o “preferen-cia u orientación sexual”, obedecen a la forma de pensar, sentir y actuar de un individuo.
Por todo lo anterior, concluyo que, en el caso del alegado discrimen por razón de género u orientación sexual, es claro que tales conceptos no se encuentran, ni expresa ni implícitamente, entre las clasificaciones sospechosas que establece nuestra Carta de Derechos. Por otro lado, el dis-crimen por género u orientación sexual en el contexto de *920 una adopción, no constituye violación a derecho fundamental alguno, pues en nuestra jurisdicción no se ha recono-cido un derecho fundamental a la adopción.(15)
Puesto que la clasificación establecida en el Art. 138 del Código Civil, supra, no constituye una clasificación sospe-chosa ni viola un derecho fundamental, y que el estatuto impugnado es de índole social, es menester evaluar su constitucionalidad según los parámetros del ya establecido y reconocido escrutinio racional.(16) A la luz del escrutinio racional se debe entonces evaluar el estatuto en cuestión presumiéndose su constitucionalidad, la cual se sostendrá a no ser que la parte que lo impugna pueda probar la au-sencia de un interés legítimo en la acción del Estado, o de un nexo racional entre ese interés legítimo y la acción o clasificación que el Estado ha establecido.(17) En el caso de autos, el Estado ha aducido que el interés legítimo que desea salvaguardar es el “proteger los valores arraigados en la institución de la familia como pilar fundamental de nuestra sociedad e impregnarle la más alta jerarquía al interés social que promueve el mejor bienestar del menor”.(18) Así surge claramente de la Exposición de Moti-vos de la Ley Núm. 8-1995, que con toda corrección cita la Opinión mayoritaria. Evidentemente, el interés señalado es uno claramente legítimo, el cual la peticionaria no ha podido desligar de la clasificación hecha por el Estado. Por lo tanto, estamos obligados a sostener la constitucionali-dad del estatuto en cuestión.
*921 III

El mejor bienestar de la menor

Preciso hacer unas expresiones en torno a ese principio cardinal de nuestro Derecho de familia que se encuentra claramente presente en la controversia que nos ocupa: el “mejor bienestar” de la menor. Parte de la prueba presen-tada mediante los informes periciales ante el Tribunal de Primera Instancia apunta a que la niña objeto de esta con-troversia goza de excelente salud física y emocional, que tiene una percepción adecuada de sí misma y de su entorno social, y que incluso muestra un desarrollo intelectual muy superior cuando se compara con su grupo normativo. De igual forma, fue parte de la prueba presentada y admitida un informe social en el cual se señala que la menor vive en una familia donde sus necesidades son satisfechas y el am-biente es seguro. En primer lugar, preciso mencionar que con relación a las evaluaciones sociales periciales en los procesos de adopción, la reciente Ley de Procedimientos Legales Especiales, Ley Núm. 186-2009, establece clara-mente que los tribunales podremos considerar las reco-mendaciones de un informe sobre estudio pericial, “pero ello no constituirá una limitación a [nuestra] autoridad para decidir sobre la adopción”.(19)
Por otro lado, no debemos olvidar que en un proceso de adopción el que se pruebe la capacidad del adulto adop-tante es un elemento importante, pero claramente no es el objetivo. El objetivo del proceso es el mejor bienestar del menor. Por eso, en el caso de autos, la evaluación de la peticionaria en su rol como madre, así como el ambiente en el hogar —círculo íntimo de la menor— son elementos im-portantísimos en el resultado final, pero no son los únicos factores a considerarse.
*922 Y es que, con relación al concepto “mejor bienestar del menor” —en el contexto de la otorgación de una custo-dia — (20) la Asamblea Legislativa ha establecido la necesi-dad de considerar cualquier factor que pueda mediar en la consecución del desarrollo óptimo del menor. Así, la Ley para la Seguridad, Bienestar y Protección de Menores, Ley Núm. 246-2011, establece que se debe buscar un “[b]alance entre los diferentes factores que puedan afectar la seguri-dad, salud, bienestar físico, mental, emocional, educativo, social y cualquier otro dirigido a alcanzar el desarrollo óp-timo del menor”. (Énfasis suplido).(21) Como vemos, el re-sultado que se busca es el mejor bienestar del menor en su desarrollo. De manera que los tribunales estamos obligados a tratar de prever, utilizando los mejores recursos disponi-bles, cuál ha de ser el desarrollo de ese menor ante los dis-tintos factores presentes y futuros a los que ha de enfren-tarse, incluyendo, según mi criterio, factores sociológicos y culturales. Es por eso, que entiendo importante reseñar un reciente estudio que provee datos científicos en torno a lo que ha sido el desarrollo de personas hoy adultas, pero que fueron adoptadas o criadas por parejas del mismo sexo, en Estados Unidos.
El estudio del Dr. Mark Regnerus(22)
En julio de 2012, la revista Social Science Research pu-blicó los resultados de la primera parte de un nuevo e im-portante estudio científico realizado por el Dr. Mark Reg-nerus, en un artículo titulado How Different are the Adult Children of Parents who Have Same-sex Relationships? *923 Findings from the New Family Structures Study.(23) Este estudio, que fue conducido por el doctor Regnerus en el Department of Sociology and Population Research Center de la Universidad de Texas, recogió y tabuló la información provista por un grupo de personas entre las edades de 18 a 39 años a través de todo Estados Unidos, que fueron cria-dos en uno de ocho composiciones o estructuras familiares distintas, incluyendo familias con padres heterosexuales, lésbicos y homosexuales. El estudio se enmarca en la pre-gunta siguiente: ¿sufren alguna desventaja los hijos cria-dos por padres del mismo sexo en comparación con los hijos criados por padres en otras estructuras familiares?
La trascendencia de este estudio estriba en al menos dos características. Primero, distinto a estudios previos so-bre estructuras familiares, en su estudio el doctor Reg-nerus incluyó comparaciones específicas con hijos criados por parejas del mismo sexo, con una muestras representa-tiva lo suficientemente grande como para poder afirmar conclusiones válidas científica y estadísticamente. La muestra fue cuidadosamente seleccionada mediante más de 15,000 entrevistas a personas de toda la nación, esco-giéndose un universo 2,988 personas de entre 18 y 39 años de edad.(24) De estos, 163 reportaron haber sido criados por su madre y su pareja (lesbianas), y 73 por su padre y su pareja (homosexuales).(25)
En segundo lugar, el estudio es novel porque los datos obtenidos no se recopilaron —distinto a estudios ante- *924 riores — (26) de los padres y sus niños (que por necesidad se encuentran bajo el control e influencia directa de sus padres). Los datos se recopilaron de jóvenes adultos y adul-tos (18-39 años) a quienes se les preguntó en torno a sus experiencias de crianza durante su niñez y adolescencia, y quienes comunicaron directa y libremente su estatus actual de vida, y sus posiciones con relación a distintos temas. Esto claramente hace el estudio más objetivo.
El estudio recopiló información mediante un cuestiona-rio entregado a las personas seleccionadas, a quienes se les había clasificado por su origen familiar en ocho tipos de estructuras familiares diferentes: los que se criaron en ho-gares de padres biológicos (papá y mamá) que permanecie-ron unidos hasta que la persona cumplió 18 años, y que todavía permanecen unidos; los que se criaron con una pa-reja de mujeres lesbianas; los que se criaron con una pa-reja de hombres homosexuales; los que se criaron con uno o ambos padres adoptivos; los que se criaron en hogares de padres biológicos (papá y mamá) que permanecieron uni-dos hasta que la persona cumplió 18 años, pero que luego se divorciaron; los que se criaron con su madre y un pa-drastro, o con su padre y una madrastra; los que fueron criados sólo por su madre o por su padre; y, por último, los que pertenecían a cualquier otra clasificación no incluida en los grupos previos.(27)

Hallazgos del estudio del Dr. Regnerus

El estudio tabula 40 diferentes resultados (contestacio-nes a preguntas), pero reportan los datos de las personas criadas por madres lesbianas y las personas criadas por *925 padres homosexuales, de manera separada. Por lo tanto, fueron en realidad 80 resultados los que puede decirse se compararon entre los hijos de parejas lésbicas y homo-sexuales vis-á-vis los hijos de otros tipos de estructura familiar. Al hacer el análisis de toda esta información, lo primero que resalta es que, cuando se compararon los hijos criados por padres heterosexuales que continuaban casa-dos al momento del estudio, con los hijos de las parejas lésbicas y homosexuales, los últimos obtuvieron peores puntuaciones en 77 de los 80 resultados.(28) De hecho, en 19 de los 20 asuntos indagados por el estudio que considero más importantes, los hijos de las parejas lésbicas u homo-sexuales reflejaron resultados generalmente muy inferio-res, en comparación con las personas pertenecientes a los 6 grupos restantes de estructuras familiares.(29) Veamos.
Los criados por parejas lesbianas y parejas homosexua-les resultaron número 1 y número 5 respectivamente en dependencia de asistencia pública. Los criados por parejas lesbianas y parejas homosexuales resultaron número 8 y 7 respectivamente (los peores en el grupo) en tenencia de empleos a tiempo completo; resultaron 1 y 3 respectiva-mente, en encontrarse desempleados; 2 y 1 respectiva-mente en pensamientos suicidas recientes. Resultaron em-pates en el segundo lugar con relación a encontrarse recibiendo algún tipo de terapias psicológicas. El 23% (ci-fra sin comparación con ningún otro grupo) de las personas criadas por parejas de lesbianas reportaron haber sido to-cadas sexualmente por alguno de sus familiares o algún otro adulto (sólo el 6% de los criados por homosexuales). ¡Según el estudio, el 31% de los adultos criados en su niñez por lesbianas, y el 25% de los adultos criados por homo- *926 sexuales, reportaron haber sido forzados alguna vez a te-ner sexo en contra de su voluntad!(30) Esas cifras no en-cuentran parangón con las de ninguno de los otros 6 grupos de estructuras familiares.
Por otra parte, según el estudio las personas criadas por parejas lesbianas y parejas homosexuales resultaron nú-mero 7 (los peores) y número 5 con relación a logros acadé-micos alcanzados. Al preguntárseles en torno a la seguri-dad que sintieron en sus hogares mientras fueron criados, resultaron los que más inseguridad sintieron (número 1 y número 2, respectivamente). Resultaron ser, además, los que más impacto negativo dijeron haber experimentado por la crianza recibida en sus hogares (número 1 y número 3, respectivamente). Fueron los más altos en índices de depresión (número 1 y número 2, respectivamente); los más bajos en nivel de ingreso por unidad familiar (8 y 4, respectivamente); 2 y 4 respectivamente, en el uso fre-cuente de marihuana; 3 y 1 respectivamente, en la frecuen-cia con que toman alcohol para embriagarse; 2 y 1 en la frecuencia con que son arrestados por las autoridades y, finalmente, hacen el número 2 y 1, respectivamente, en la frecuencia con la que se declaran culpables de delitos graves. (31)
Ahora bien, ¿implica esto que los resultados arrojados por este estudio debieron incluirse entre los factores a con-siderarse en la evaluación de este caso? De ninguna manera.(32) Y es que este estudio no fue parte de la prueba *927 presentada en el caso de autos. Además, obsérvese, que el estudio del doctor Regnerus va dirigido a establecer una *928 realidad fáctica mediante prueba científica, sin indagar ni mencionar cuáles factores contribuyeron o pudieron haber contribuido a la materialización de tal realidad. Entonces, ¿cuál es la pertinencia del estudio? Entiendo que, al igual que la controversia en el caso de autos nos muestra una realidad fáctica de nuestra sociedad, el estudio del doctor Regnerus nos muestra otra realidad que el Estado, en su deber de parens patriae y dentro del marco del “mejor bien-estar del menor”, debe considerar al momento de evaluar todo lo relacionado con la adopción por parte de parejas del mismo sexo, indagando qué factores produjeron los resul-tados de este revelador estudio.

Padres “intercambiables”

Por otro lado, al argumentar en favor de la capacidad de una pareja del mismo sexo para criar a cualquier menor, líderes y activistas de la comunidad homosexual recurren a una teoría que, en realidad, choca contra la realidad de lo que esa comunidad piensa. Estos líderes reclaman que las figuras del padre y la madre dentro del marco de la crianza de un menor son en realidad intercambiables. Esto es, us-ted puede sustituir por el opuesto cualquiera de las dos figuras, ya sea la paterna o la materna.(33) De esta manera, reclaman que dos hombres o dos mujeres pueden hacer tan buen trabajo criando como puede hacerlo una pareja heterosexual, porque un hombre o una mujer, per se, nada único o especial tienen que puedan proveerle a un niño. O sea, argumentan estos líderes que un hombre, por el solo hecho de ser un hombre, nada especial o particular es ca-paz de proveerle o influenciar en una criatura, y una mu-jer, por el solo hecho de ser una mujer, nada especial o *929 particular es capaz de proveerle o influenciar en una criatura.
El problema con tal afirmación —aparte de la ausencia de datos empíricos que la respalden— es que incita la in-terrogante siguiente: ¿por qué se puede afirmar que los hombres y las mujeres son intercambiables como padres pero no como pareja sexual? ¿Por qué cuando se trata de criar a un niño da lo mismo el sexo de la pareja, pero cuando se trata de la persona con la que me quiero relacio-nar sexualmente sí tiene relevancia su sexo? Por ejemplo, una persona homosexual, por definición, es aquella que tiene una preferencia u orientación sexual hacia otro varón. Esa persona evidentemente encuentra algo en el sexo masculino que no encuentra en el sexo femenino. De manera que, para la persona homosexual o lesbiana, el sexo de la persona con la que se relaciona sexualmente es sólo uno, y no es intercambiable.(34) Entonces, ¿cómo puede ser que en la monumental tarea de la crianza de un niño o una niña, el sexo de quienes los críen sí puede ser inter-cambiable? O, lo que es lo mismo, ¿cómo puede ser que en el desarrollo de un menor no tenga importancia eso tan especial que tiene un hombre, por el solo hecho de ser hombre, y una mujer, por el solo hecho de ser mujer?

IV

Por último, soy consciente de que la realidad del estado de Derecho actual en nuestra jurisdicción con relación a la controversia que nos ocupa no es de satisfacción para aque-llos ciudadanos que, como la peticionaria, honestamente visualizan el concepto “familia” desde su particular cosmovisión. Con relación a ese punto, y conforme se ex- *930 presa correctamente en la Opinión del Tribunal, no le co-rresponde a esta Curia, en ausencia de un reclamo válido de un derecho constitucional, cambiar tal realidad legal. Ciertamente, deberá ser el Poder Legislativo en conjunto con el Poder Ejecutivo los que cambien, si así lo entienden justo, sabio y prudente, el “cauce natural de ese río”.
Mientras tanto, aunque el Derecho puertorriqueño per-mite el que dos damas se pongan de acuerdo y tengan como objetivo común una infinidad de cosas, no lo consiente así en instancias como la presente. En nuestra jurisdicción, y por las razones que sean —culturales, religiosas, por el simple sentido natural de las cosas o todas las anteriores— si dos féminas se proponen como objetivo común ser ma-dres, para que puedan registrar oficialmente tal materni-dad, cada una deberá tener su propia criatura.
Por estas y las razones que se esbozan en la Opinión del Tribunal, estoy conforme.
— O —

 Soy consciente que, al hacer esta expresión, parezco reflejar mi criterio personal en torno a esta controversia. Sin embargo, más bien intento plasmar o ser reflejo de lo que, desde mi particular punto de vista, es la posición de la gran mayoría de nuestro Pueblo. Tal vez, hay quien pudiera pensar que los Jueces de esta Curia no estamos llamados a eso. No entraré en ese tipo de disquisiciones. Lo que sí puedo advertir es que, si así fuera, no es este Juez el primero que expresa su percepción personal con relación a este tipo de controversias. Me remito al Voto de conformidad emitido por el distinguido Juez Asociado Señor Fuster Berlingeri, q.e.p.d., en el caso de Pueblo v. Santos Molina, 133 D.P.R. 416, 422 (1993) (Sentencia), al que se unió el entonces Juez Presidente Señor Andréu García:
“Además de los fundamentos estrictamente jurídicos antes expuestos, debe con-siderarse que, en un país como el nuestro, la mayoría de la gente probablemente ha oído hablar de la bíblica ciudad de Sodoma y de las prácticas sexuales aberrantes que allí se practicaban, origen histórico del término ‘sodomía’. Más aún, el concepto ‘contra natura’ incluido en la definición estatutaria de sodomía implica que lo que se penaliza es toda relación sexual realizada en forma contraria al modo natural de hacerlo, como es una relación sexual anal. Aun las personas jóvenes o iletradas co-nocen la forma natural en que se realiza el acto sexual, por lo que pueden entender que cualquier acto contrario a esa forma natural constituye conducta proscrita por el estatuto en cuestión. Estas consideraciones lógicas, que están basadas en la experien-cia común que todos compartimos, tienen verificación empírica”. (Citas omitidas y énfasis suplido).

 Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1044.

 Al concluir esto, no ignoro la existencia de la terrible condición de Inter-sexualidad o Desórdenes del Desarrollo del Sexo (“disorders of sex development (DSD)”). Debido a esta condición, existen personas que poseen características gené-ticas y fenotípicas propias de hombres y mujeres, en grados variables. No obstante, la realidad objetiva es que, además de ser una condición extremadamente rara, esta no constituye una clasificación sexual (masculino-femenino) sino que, como lo indica su propio nombre, es un desorden sexual que normalmente es corregido mediante cirugía.

 Delgado, Ex parte, 165 D.P.R. 170 (2005). Véanse, además: Frontiero v. Richardson, 411 U.S. 677 (1973); Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164 (1972).

 Frontiero v. Richardson, supra.

 Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, El discrimen por razón de género en los tribunales, agosto de 1995, págs. 4-5.

 Sabido es que cualquier tipo de operación para “cambiar” el sexo de una persona solo producirá efectos estéticos, pues los cromosomas de esta seguirán defi-niendo su sexo de la manera en que fue engendrada y concebida.

 Entiéndase, la razón o las razones —muchos exponen que es un asunto mul-tifactorial— por las cuales una persona manifiesta una preferencia u orientación sexual hacia personas de su mismo sexo, no está ante nuestra consideración. Lo que nos es pertinente atender, ante el reclamo de la peticionaria, es la manera en que paulatinamente la sociedad ha comenzado a visualizar los roles del hombre y la mujer en su desarrollo, y que aparentemente la ha llevado a reconocer esta nueva construcción social y cultural que se conoce como “género”.

 Como bien señala la Opinión del Tribunal, el claro historial de la Convención Constituyente, así como nuestros propios precedentes a través de décadas, dejan muy claro el alcance o extensión del concepto “discrimen por razón de sexo”.

 Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 272.

 Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010); López v. E.L.A., 165 D.P.R. 280 (2005); San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405 (1993); Berberena v. Echegoyen, 128 D.P.R. 864 (1991).

 Domínguez Castro et al. v. E.L.A. I, supra.

 Íd., pág. 74.

 Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1045 esc. 41.

 López v. E.L.A., supra. Véanse, también: Mullins v. Oregon, 57 F.3d 789, 794 (9no Cir. 1995); Lindley v. Sullivan, 889 F.2d 124, 131 (7mo Cir. 1989).

 Domínguez Castro et al. v. E.L.A. I, supra; Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999); Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975).

 Domínguez Castro et al. v. E.L.A. I, supra; López v. E.L.A., supra.

 Alegato de la Procuradora General, pág. 26.

 32 L.P.R.A. sec. 2699(4).

 Obsérvese que ni el Código Civil ni las leyes especiales en vigencia relativas a la adopción, ni en la jurisprudencia de este Tribunal se ha definido nunca expre-samente el concepto “mejor bienestar del menor”.

 8 L.P.R.A. sec. 1101(x).

 El Dr. Mark Regnerus es profesor asociado de Sociología en la Universidad de Texas, en Austin, Estados Unidos.

 41 (Núm. 4) Social Science Research 752 (julio 2012). www. sciencedirect.com/sience/article/pii/S0049089X12000610 (última visita el 4 de febrero de 2013).

 M. Regnerus, How Differ-ent are the Adult Children of Parents who have Same-sex Relationships? Findings from the New Family Structures Study, 41 (Núm. 4) Social Science Research, 752, 756 (julio 2012).

 Íd., pág. 757.

 Para un excelente análisis del problema de muestreo y representatividad en muchos de los estudios científicos previos publicados sobre este tema, véase el artículo de la Dra. Loren Marks, Same-sex Parenting and Children’s Outcomes: A Closer Examination of the American Psychological Association’s Brief on Lesbian Gay Parenting”, 41 (Núm. 4) Social Science Research 735 (julio 2012). www. sciencedirect.com/sience/article/pii/S0049089X12000580 (última visita el 4 de fe-brero de 2013).

 Regnerus, supra, pág. 758.

 Íd., pág. 761.

 Interesantemente, más del 60% de las personas criadas por parejas lesbia-nas reportaron ser totalmente heterosexuales y sólo un 7% reportó tener una rela-ción lésbica o homosexual al momento. Asimismo, más del 70% de las personas cria-das por parejas homosexuales reportaron ser totalmente heterosexuales y sólo un 12% reportaron tener una relación lésbica o homosexual al momento.

 Regnerus, supra, pág. 761.

 Íd., pág. 762.

 En la ponencia que originalmente circulé entre los componentes de este Tribunal, estas expresiones no tenían énfasis alguno. No obstante, me veo precisado a destacarlas, pues aparentemente pasaban desapercibidas. Solo así se puede justi-ficar el señalamiento que hace en mi contra el distinguido Juez Presidente, Hon. Federico Hernández Denton, en su opinión disidente. Señala el Juez Presidente lo siguiente: “Recordemos que nos corresponde hacer nuestra determinación basándo-nos en el expediente del caso”. Opinión disidente del Juez Presidente Señor Hernán-dez Denton, pág. 988. Acto seguido, y en el escolio correspondiente a esa expresión *927 —esc. 14 — , el Juez Presidente expresa lo siguiente: “[E]l compañero Juez Asociado Señor Kolthoff Caraballo, por el contrario, recurre a prueba [científica] exógena...”. (Enfasis suplido). Evidentemente este señalamiento es errado e injusto. Es claro que una vez reseño el estudio científico del doctor Regnerus, responsablemente hago el caveat de que este no puede ser utilizado en la solución del caso.
Además, y como surge también claramente de esta ponencia, la reseña que hago del estudio científico del doctor Regnerus va dirigida a alertar a la Legislatura no solo del reclamo de la peticionaria del caso de autos, sino de otras realidades que, prima facie, están siendo avaladas por datos científicos. Y es que cuando el Tribunal Supremo, en el ejercicio de su poder constitucional, pauta una norma no habla solo a las partes en el caso, sino a la comunidad jurídica, a la Academia y al Pueblo. Así, cuando un Juez de esta Corte, dentro de una controversia jurídica, escribe una particular expresión, ya sea en forma de disenso o como una opinión de conformidad, transmite un mensaje también a todos los componentes antes mencionados inclu-yendo, de igual forma, al Pueblo. Y ese Pueblo comprende, claro está, las ramas hermanas de gobierno.
Por otro lado, y con relación al ataque que el Juez Presidente hace al estudio científico del doctor Regnerus, es menester aclarar unos puntos. En primer lugar, no es de extrañar que este estudio creara tanta conmoción entre la comunidad cientí-fica, sobre todo aquella identificada con las comunidades homosexuales y lésbicas. Y es que, los resultados arrojados por el estudio del doctor Regnerus parecen contra-decir más de 50 estudios anteriores. Sin embargo, y en segundo lugar, lo que el Hon. Juez Presidente ignora o convenientemente obvia señalar es que, ante el revuelo creado, el estudio del doctor Regnerus ha sido sometido a varias investigaciones por sus pares e incluso por la Universidad de Texas, en las que se han concluido que la investigación y los resultados publicados por este cumplen cabalmente con los están-dares de la comunidad científica. www.utexas.edu/news/2012/08/ 29regnerus_seientific_misconduct_inquiry_ completed/ (última visita el 16 de febrero de 2013) www.nytimes.com/2012/10/13/us/mark-regnerus-and-the-role-of-faith-in-academics.html?_r=0 (última visita el 16 de febrero de 2013).
En cuanto a los señalamientos que el propio doctor Regnerus admite con rela-ción a algunas nomenclaturas mal utilizadas en el referido estudio, claramente este ha señalado que eso en nada afecta los resultados del estudio, y que él se sostiene en esos resultados. Además, recientemente —noviembre de 2012— el doctor Regnerus publicó otro estudio en respuesta a las interrogantes y señalamientos hechos contra su primer estudio. En este se aclaran algunos puntos y se validan los hallazgos que se habían publicado en el primer estudio. Véase M. Regnerus, Parental Same-sex Relationships, Family Instability, and Subsequent Life Outcomes for Adult Children: Answering Critics of the New Family Structures Study with Additional Analysis, 41 (Núm. 6) Social Science Research 1367-1377(2012). www.sciencedirect.com/science/ article/pii/S0049089X12001731 (última visita el 16 de febrero de 2013).
Por último, debo admitir que me sorprenden los señalamientos del compañero Juez Presidente en cuanto a la utilización del estudio del doctor Regnerus por parte del que suscribe, en primer orden, y contra el estudio propiamente, en segundo orden. Como indiqué, me parece que el primero es un señalamiento errado e injusto, y el segundo es un poco deshonesto. Sin embargo, lo que realmente me preocupa es la posibilidad de que tales señalamientos pudieran obedecer a una defensa apasionada por parte del Juez Presidente ante la particular sensibilidad que este admite ha desarrollado con relación a este tema. Véase Opinión disidente del Juez Presidente Señor Federico Hernández Denton, págs. 975-976. Y es que me pregunto si su crítica por la utilización del referido estudio científico se hubiera dado si en lugar de lo que dice, el estudio favoreciera su posición en esta controversia.
*928 Por eso, respetuosamente me permito recordarle al apreciado Juez Presidente • — él sabe que lo aprecio— que mal hacemos cuando en la defensa de lo que creemos causas justas, cometemos injusticias. Además, los Jueces de esta Curia no estamos llamados ni a defender causas justas ni a combatir injusticias, sino a —en el análisis responsable y ponderado del Derecho— perseguir la justicia.

 J. Roback Morse, Perspectives: Gay Men Only?, www.ruthblog.org/1210/06/ 12/perspective-gay-men-only/ (ultima vista el 4 de febrero de 2013).

 Lo mismo aplica en el caso de las personas bisexuales, pues estas, por defi-nición, sienten la misma atracción por el sexo masculino que por el femenino. De manera que la persona bisexual no descarta a ninguno, sino que, al contrario, en-cuentra algo especial en los dos.